UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY and ADM RICE, INC., | 11 Civ. 0988 (JSR) |
| **Plaintiffs,** | **DECLARATION OF CHRISTIAN BONNESEN IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION** |
| **v.** | |
| JPMORGAN CHASE BANK, N.A., | |
| **Defendant.** | |
| | **ECF Case** |

STATE OF NEW YORK          )
                          )
COUNTY OF WESTCHESTER)

    CHRISTIAN BONNESEN, declares under penalty of perjury, as follows:

    1. I am the president of plaintiff ADM Rice, Inc. ("ADM Rice"), whose principal place of

business is located at Suite 605, 660 White Plains Road, Tarrytown, NY 10591. I have held that

position since the company was established in 1999. In addition, I am an employee of plaintiff

Archer Daniels Midland Company ("ADM").

    2. ADM, which has its headquarters in Decatur, Illinois, is a large agricultural

conglomerate with operations around the United States and in various overseas locations. ADM

Rice is a wholly-owned subsidiary of ADM.

- 1 -

3. ADM Rice buys rice and wheat in the United States and other countries and exports these commodities to various countries around the world, including Iraq. ADM Rice has been selling rice and wheat to the Grain Board of Iraq (GBI"), which is under the supervision of the Ministry of Trade of the Government of Iraq, since 2005. I am fully familiar with ADM Rice's activities in this regard.

### The Letter of Credit Application by ADM

4. On August 25, 2010, the GBI advised ADM Rice that the GBI had accepted an offer by ADM Rice to sell approximately 120,000 metric tons of "American rice" to the GBI on the basis of CIF liner out, Umm Qasr, Iraq, terms, at a cost of $549.75 per metric ton. The contract award document required that ADM Rice arrange a performance bond in the amount of 10% of the contract value through a bank in Iraq. A copy of the August 25, 2010 email and attached award document are annexed as Exhibit A to this declaration.

5. On August 26, 2010, ADM, as Applicant/Obligor, for and on behalf of ADM Rice, as the Account Party, applied for issuance by defendant JPMC of a letter of credit in the amount of $6,926,850.00 so that the required Performance Bond could be issued in favor of the GBI. A copy of the letter of credit application is annexed as Exhibit B to this declaration.

6. Attached to the application was the wording for the Performance Bond, which was intended for quality claims. Accordingly, the second paragraph of that wording was as follows:

> All claims made under this performance bond must be accompanied by an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications.

- 2 -

This wording has been used and accepted in prior Performance Bonds arranged by ADM Rice for GBI's benefit and was accepted in this transaction as well.

7. SGS is an international organization that inspects and verifies the quantity, weight and quality of traded goods. They are well known to and frequently used by companies involved in the international grain trades.

**The Standby Letter of Credit and Performance Bond**

8. On August 27, 2010, JPMC issued its irrevocable standby letter of credit no. TFTS-868801 to the Trade Bank of Iraq ("TBI") in the amount of $6,926,850.00. The letter of credit requested the TBI to issue a performance bond in the same amount for the account of ADM Rice in favor of the GBI. The actual terms that were to appear in the Performance Bond – including the requirement that all claims thereunder must be accompanied by an adverse SGS quality report – were explicitly set forth in the letter of credit itself, a copy of which is annexed as Exhibit C to this declaration. The terms stated in the letter of credit, provided in part as follows:

> All claims made under this performance bond must be accompanied by an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications.
>
> We hereby guarantee to pay to The Development Fund for Iraq, for your account , such amount as you may claim from us hereunder upon presentation of your first written demand at our counters purporting to be signed by your authorised signatory specifying the amount claimed hereunder, certifying that the Customer has failed to fulfill their obligations to you and a detailed explanation of such failure to comply with the contract, and accompanied by the SGS original laboratory report as stated above.

9. On or about September 2, 2010, the TBI issued a Performance Guarantee/ Performance Bond, no. IGT1011517DRE, in the amount of $6,926,850.00 to the GBI in

connection with contract no. MOT/GB/R5/4/2010.  As issued, the terms of the Performance Bond matched the terms stated in the letter of credit.  A copy of the Performance Bond is annexed as Exhibit D to this Declaration.

10.  A copy of the Performance Bond, signed on behalf of the TBI, was sent to JPMC, who forwarded same to Shannon Nail of ADM on September 10, 2010.  (Ms. Nail is the head of ADM's Documentary Collections and Accounts Receivable Department and works at ADM's headquarters in Decatur, Illinois.)  As noted above, the terms of the Performance Bond, as issued, mirror the specimen language that was contained in ADM's application for the letter of credit and in the letter of credit itself.  Thus, by the terms of the Performance Bond, the TBI should not honor a drawing demand unless the documentation presented thereunder includes *"an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications"* (emphasis added).

11.  A copy of the correspondence by which JPMC transmitted the copy of the signed Performance Bond to ADM is attached as Exhibit E to this Declaration.

### The Underlying Sales Contract

12.  The sales transaction between GBI and ADM Rice was memorialized in contract no. MOT/GB/R5/4/2010, dated September 6, 2010.  A copy of the sales contract is annexed as Exhibit F to this declaration.

- 4 -

13. Consistent with the terms of the contract award document (see paragraph 4 above), paragraph 13 of the sales contract required ADM Rice, as the seller, to arrange a performance bond in the amount of 10% of the contract value through a bank in Iraq.

14. Pursuant to sales contract no. MOT/GB/R5/4/2010, ADM Rice has shipped rice from the United States to Iraq on three vessels. The quality of the rice was certified by SGS and the U.S. Department of Agriculture ("USDA") before the vessels left the U.S. loading ports.

15. The first of the three vessels, the M/V CAPTAIN HARRY, has just recently completed unloading its cargo of approximately 40,000 metric tons of rice at Umm Qasr, Iraq. The other two vessels are still en route.

16. To date, ADM Rice has not received any notification from the GBI of a claim in connection with the quality of the rice unloaded from the CAPTAIN HARRY at Umm Qasr.

## The Wrongful Demand

17. In the early afternoon of Friday, February 11, 2011, I learned that Andrew Kosik of JPMC sent an email to other employees in the bank, indicating that, in his view, JPMC had "received an in compliance drawing" under the standby letter of credit in favor of TBI and that (because JPMC intended to honor the request) a reimbursing payment should be sent to JPMC. Mr. Kosik's email read as follows:

> We received an in compliance drawing under SBLC No. TFTS-868801 for USD6,926,850.00
>
> Obligor: Archer Daniels Midland Co. (CIF 9102747079)

- 5 -

Presenter: Trade Bank of Iraq

Beneficiary: Trade Bank of Iraq

### AMOUNT

PRINCIPAL    USD  6,926,850.00

PAYMENT COMMISSION  USD   6,926.85

      TOTAL USD 6,933,776.85

Please arrange to wire immediately available funds in the amount

of USD6,933,776.85

To:

JPMORGAN CHASE BANK N.A.

ABA NUMBER: 021000021

ACCOUNT NUMBER: 324-331754

REFERENCE LC NO. TFTS-868801

Attn: SBLC Dept.

  18. I became aware of the transmission of Mr. Kosik's email because, after he sent it,

Satya Kharga of JPMC forwarded Mr. Kosik's email to Shannon Nail and, when Ms. Nail replied

to Ms. Kharga's email, she copied me on the reply, thereby providing me with the email string

that included Mr. Kosik's message about the drawdown. A copy of the email string in which Mr.

Kosik's email appears is annexed as Exhibit G to this Declaration

## Notifications to JPMC

19. Upon receipt of this news, I was very concerned that a demand for a drawing had been made against the letter of credit at a time when ADM Rice had not been made aware of any claim about the quality of the cargo that had been transported on the CAPTAIN HARRY. As a result, on the afternoon of Friday, February 11th, I sent a letter by email to Mr. Danny Kim, a vice president in the Global Trade Services unit at JPMC, in which I warned that ADM Rice considered that the demand for payment was "wrongful and not in compliance with the terms of the Performance Bond." I proceeded to explain in the letter that a demand for a drawing under the letter of credit would be wrongful "because only the first shipment has been delivered, and because, contrary to the explicit requirements of the Performance Bond, there cannot be 'an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications'." (My reference to the "first shipment" was to the rice unloaded from the CAPTAIN HARRY.) I concluded my letter as follows:

> We further place you on notice that, in the present circumstances, any statement that you may receive purporting to confirm that a demand has been presented, and that it is in accordance with the Performance Bond, cannot be correct, or truthful, and cannot be relied upon to satisfy the requirements for your obligations to pay under the Standby Letter of Credit.

20. A copy of my February 11, 2011 letter to JPMC is annexed as Exhibit H to this Declaration.

## No Adverse Quality Report from SGS

21. My concern about the lack of any basis for a claim against the Performance Bond prompted me to ask Ashish Mathur, an employee of ADM Rice, to contact SGS in Iraq. At my request, Mr. Mathur sent an email to SGS in which he asked the following:

### MV Captain Harry currently discharging at Um Qasr

As understand it discharge is proceeding normally and the cargo is on specification.

Can you please advise urgently whether or not SGS have issued a laboratory report in relation to this cargo certifying that the quality of the purchased rice does not meet the contractual specifications

A copy of Mr. Mathur's email to SGS is annexed as Exhibit H to this Declaration.

22. On Saturday, February 12th, the branch manager of the Iraqi Branch of SGS Gulf wrote back to Mr. Mathur and said simply that "We never issued such report." Read in the context of Mr. Mathur's message to SGS, their reply can only mean, of course, that SGS have not issued "a laboratory report in relation to this cargo certifying that the quality of the purchased rice does not meet the contractual specifications." SGS's reply to Mr. Mathur appears in the document annexed as Exhibit I to this Declaration.

## Further Notifications to JPMC

23. A copy of my February 11th letter has also been sent to the office of JPMC Global Trade Services in Chicago, whose address appears on the standby letter of credit. Included with that letter was a copy of the email exchange, described in paragraphs 20 and 21 above, confirming that SGS has not issued "a laboratory report in relation to this cargo certifying that

the quality of the purchased rice does not meet the contractual specifications." The entire set of documents sent to JPMC in Chicago and in New York, including a covering letter from the law firm representing plaintiffs in this lawsuit, is attached as Exhibit J to this Declaration.

### Conclusion

24. ADM Rice believes there is absolutely no factual basis for the TBI to demand a drawing under the letter of credit because any payment they have made under the Performance Bond was not in conformance with its terms, as required by the letter of credit. As I pointed out in my February 11th letter to JPMC, "any statement that you may receive purporting to confirm that a demand has been presented, and that it is in accordance with the Performance Bond, cannot be correct, or truthful, and cannot be relied upon to satisfy the requirements for your obligations to pay under the Standby Letter of Credit."

CHRISTIAN BONNESEN

### DECLARATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing is true and correct and has been executed on this, the 13th day of February, 2011.

CHRISTIAN BONNESEN

- 9 -

# EXHIBIT A

**Rodriguez, Jorge**

| | |
|---|---|
| **From:** | import3 [import3@iqgrainb.com] |
| **Sent:** | Wednesday, August 25, 2010 5:19 AM |
| **To:** | Rodriguez, Jorge |
| **Subject:** | RICE TENDER NO. MOT/RICE/5/2010 |
| **Attachments:** | Mail0487.JPG |

## MINISTRY OF TRADE/GRAIN BOARD OF IRAQ
## TO: ADM

**REF :2177**
**DDT :25/8/2010**

**Dear Sir;**
**Pls open attach file ..**
**B.regards**

1

**REPUBLIC OF IRAQ**

**Ministry Of Trade**

Grain Board Of Iraq





No.: 2177
Date: 25 / 8 /200

البرقم : ٢١٧٧
التاريخ: ٢٠١٠ / ٨ / ٢٥

MINISTRY OF TRADE / GRAIN BOARD OF IRAQ
TO: ADM

REF · 2177
DDT : 25/8/2010

### AWARDING

SUBJECT : RICE TENDER NO. MOT/RICE/5/2010

YOU ARE AWARDED THE QTY OF 120 000 MT OF AMERICAN RICE +/-
5 % AT PRICE OF( 549,75) USD C&F (LINER OUT) UMM QASER PORT.

DELIVERY PIRIEOD TO UMM QASER PORT : OCTOBER- NOVEMBER

---- ALL OTHER TERMS AND CONDITIONS AND SPECIFICATIONS AS
PER OUR TENDER MENTIONED ABOVE .

----WE AWAIT RECEIVING YR CONFIRMATION WITHIN 24 HOURS .

---- THE PERFORMANCE BOND 10% OF CONTRACT VALUE SHOULD
BE SUBMITTED  WITHIN 10 DAYS FROM DATE OF THIS  E-MAIL
ISSUED BY ANY IRAQI BANK ( INSIDE BAGHDAD) DEPENDED BY
CENTRAL BANK OF IRAQ

------ STAMP TAX SHOULD BE SUBMITTED AS PER TENDER TERMS

REGARDS

Muthanna

MUTHANA JABBAR ABDUL ZAHRA
ACTING DIRECTOR GENERAL

25 - 8 - 2010

# EXHIBIT B

## Application and Agreement for Irrevocable Standby Letter of Credit

# J.P.Morgan

**WHEN TRANSMITTING THIS APPLICATION BY FACSIMILE ALL PAGES MUST BE TRANSMITTED.**

**To: JPMorgan Chase Bank, N.A. and/or its subsidiaries and/or affiliates.**          Date: August 26, 2010

I. Pursuant to the Terms and Conditions contained herein, please issue an IRREVOCABLE STANDBY Letter of Credit (together with any replacements, extensions or modifications, the "Credit") and transmit it by:

⊠ Teletransmission          ☐ Courier

*If completing in Microsoft Word, please enter data by 'clicking' on the gray boxes.*

| | |
|---|---|
| **Applicant/Obligor** (Full name and address- jointly and severally if more than one, individually and collectively, "Applicant/Obligor"): <br> Archer Daniels Midland Company <br> 4666 Faries Parkway <br> Decatur, IL 62526 <br><br> [Signature lines are on last page]. | **Beneficiary** (Full name and address): <br> Trade Bank of Iraq <br> Central Bank Building <br> 4th Floor - Rasheed Street <br> Baghdad, Iraq <br> Tel: 964-7901-916552 <br> Fax: 13092769218 |
| **Account Party** (Full name and address of entity to be named in Letter of Credit if different than the above Applicant/Obligor): <br> ADM Rice, Inc. <br> 660 White Plains Road <br> Tarrytown, New York 10591 | **Advising Bank-Optional** (If blank, Issuer will select its branch or affiliate or correspondent in the domicile of the beneficiary): <br> N/A |
| **Amount:** <br> Up to an aggregate amount of $6,926,850.00 <br> If not USD, indicate currency | **Expiry Date:** Demands/claims must be presented to the counters of the Nominated bank not later than March 15, 2011 <br> . |

**Complete only if Automatic Extension of the expiry date is required.**

Credit to contain Automatic Extension clause with extension period of ☐ one year/☐ other                    (please specify).

No less than              calendar days non-extension notice to the beneficiary.

Automatic Extension final expiration date:                    (the date after which the Credit will no

longer be subject to Automatic Extension).

**AVAILABLE BY** (indicate A, B or C)

☐ A.  Beneficiary's dated statement referencing JPMorgan Chase Bank, N.A. Letter of Credit Number indicating amount of demand/claim and purportedly signed by an authorized person reading as follows (Please state within the quotation marks the wording to appear on the statement to be presented):

"  (insert appropriate reason for drawing)

.

"

☐   Demands received by authenticated teletransmission are acceptable in lieu of the beneficiary's signed and dated statement provided that such authenticated teletransmission contains the beneficiary's statement as provided for in the Credit.

☒ B. See attached sheet(s) for continuation of other documents and/or special instructions, which form an integral part of this Application and such specimen should be approved and signed by the applicant/obligor.

☐ C. Other:

*Complete only when the Beneficiary's bank or Correspondent is to issue its guarantee or undertaking based on the issued Standby Letter of Credit.*

**We understand and agree that by making this request, we shall remain liable under this Credit until Issuer is fully released in writing by such entity.**

☒ Request Beneficiary's bank to issue and deliver its: Performance Bond
(Specify type of bid or performance bond, guarantee, undertaking or other)

| In favor of: | Name(s) | Ministry of Trade/Grain Board of Iraq |
| | Attention Party Name | |
| | Address | P.O. Box 329 |
| | | |
| | City/State/Zip/Country | Baghdad, Iraq |
| | Telephone | 96414168124 |
| | Fax | |

For an amount not exceeding that specified above, effective immediately and expiring at their office on March 1, 2011

(at least 30 days prior to Expiry Date above) covering (brief description): Shipment of 120,000 metric tons plus or minus five percent of U.S. Rice under contract MOT/GB/R5/4/2010. .

☐ Multiple drawings prohibited (if blank, multiple drawings will be permitted).

☐ Partial drawings prohibited (if blank, partial drawings will be permitted).

☐ Credit is transferable only in its entirety (Issuer is authorized to include its standard transfer conditions and is authorized to nominate a transferring bank, if applicable).

**The Credit, or any Credit issued shall be subject to the International Standby Practices 1998, International Chamber of Commerce Publication 590 ("ISP") or, ☒ if box is checked, it shall be subject to the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 ("UCP").**

Please include a brief description of the purpose of the Standby Letter of Credit including goods description, pricing, country of origin of the goods, shipment from and shipment to countries, as applicable:
**Performance guarantee under a contract to deliver US rice to Iraq.**

Unless otherwise stated herein, the nominated bank (if any) is authorized to send all documents to you in one airmail or courier service, if available.

**II:** To induce JPMorgan Chase Bank, N.A. and/or any of its domestic or foreign subsidiaries or affiliates (individually and collectively, **"Bank"**), in its sole discretion, to issue for the account of the Applicant or for the account of the Account Party named in the Application, a standby letter of credit, or other independent undertaking at the request of the undersigned (individually and collectively, **"Applicant"**; jointly and severally, if more than one), Applicant agrees as to the letter of credit or undertaking (together with any replacements, extensions or modifications, a **"Credit"**, collectively, **"Credits"**) as follows.

1. **Applications/Instructions.** The request to issue a Credit (an **"Application"**) shall be irrevocable and in such form as Bank shall from time to time require or agree to accept (including any type of electronic form or means of communication). Inquiries, communications and instructions (whether oral, telephonic, written, telegraphic, facsimile, electronic or other) regarding a Credit, each Application and this Agreement are each referred to herein as **"Instructions"** (and the term "Application" is subsumed within the term "Instruction"). Bank's records of the content of any Instruction shall be conclusive. Applicant shall be responsible for the final text of a Credit notwithstanding Bank's recommendation, assistance or drafting or Bank's use, non-use or refusal to use text submitted by Applicant. Bank may transmit a Credit and any amendment thereto by S.W.I.F.T. message and thereby bind Applicant directly and as indemnitor to the S.W.I.F.T. rules, including rules obligating Applicant or Bank to pay charges.

2. **Payment Terms; Obligations Absolute.** (a) For each Credit, Applicant shall pay Bank: (i) the amount of each drawing paid by Bank under the Credit on demand, if under a sight draft and at least one Business Day prior to the date when payment is to be made under a time draft (or acceptance relating thereto) or deferred payment obligation; (ii) commissions, fees and charges in respect of the Credit (including, commissions and fees for issuance, transfer, assignment of proceeds, amendments and drawings and of any adviser, confirming institution or entity or other nominated person), at such rates, amounts and times as Bank and Applicant shall mutually agree (or if no agreement, the rate then customarily charged by Bank); (iii) interest on each amount under this Agreement for each day from and including the date such payment is due through the date of payment, on demand, at a rate per annum (calculated on the basis of a 360 day year for the actual number of days elapsed) equal to the lesser of (A) Prime plus 4% and (B) the highest rate permitted by applicable law; (iv) Bank's charges, costs and expenses (including reasonable internal and outside counsel fees, expenses and charges) incurred in connection with the protection or enforcement of Bank's rights under this Agreement and any correspondent's charges, with interest from the date paid or incurred by Bank through the date of payment by Applicant, on demand, at a rate per annum equal to Prime plus 4%; and (v) if as a result of any Regulatory Change, the Bank determines that the cost to the Bank of issuing or maintaining any Credit is increased, or any amount received or receivable by the Bank hereunder is reduced, or the Bank is required to make any payment in connection with any transaction contemplated hereby, then the Applicant shall pay to the Bank on demand such additional amount or amounts as the Bank determines will compensate the Bank for such increased cost, reduction or payment. **"Regulatory Change"** means any change after the date hereof in United States federal, state or foreign laws or regulations (including Regulation D of the Board of Governors of the Federal Reserve System as amended or supplemented from time to time) or the adoption or making after such date of any interpretations, directives or requests applying to a class of banks including the Bank or under any United States federal or state, or any foreign, laws or regulations (whether or not having the force of law) by any court or governmental or monetary authority charged with the interpretation or administration thereof. **"Business Day"** means any day on which commercial banks in New York City, New York are not authorized or required to be closed for business. **"Prime"** shall mean the rate of interest per annum announced by the Bank from time to time as its Prime Rate; each change in the Prime Rate shall be effective from and including the date such change is announced as being effective.

(b) If the amount drawn under any Credit is in non-United States currency (**"foreign currency"**), Applicant shall pay under paragraph 2(a)(i) above the United States dollar equivalent of the amount computed at Bank's selling rate, as of the date of Applicant's payment, for cable transfers of such foreign currency to the place of payment; provided, further, that if, for any reason, Bank has no selling rate for cable transfers of that currency to such place on the payment date, Applicant shall pay Bank an amount in United States currency equivalent to Bank's actual cost of settlement of its obligation.

(c) All payments shall be made in immediately available funds, free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges, withholdings, set-off or other liabilities. Applicant shall pay all withholding, stamp and other taxes or duties imposed by any taxing authority on payment under any Credit and this Agreement and shall indemnify Bank against all liabilities, costs, claims, and expenses resulting from Bank having to pay or from any omission to pay or delay in paying any duty or tax.

(d) Bank may (but shall not be required to), without demand for payment or notice to the Applicant, and in addition to any other right of set-off which Bank may have, (i) debit any account or accounts maintained by Applicant with any office of Bank (now or in the future) and set-off and apply (X) any balance or deposits (general, special, time, demand, provisional, final, matured, unmatured, contingent or absolute) in the account(s) and (Y) any sums due or payable from Bank, to the payment of any and all amounts owed by Applicant to Bank and/or (ii) advance funds to Applicant under any line of credit (committed or uncommitted) made available to Applicant by Bank and apply such funds to said payment obligations.

(e) Applicant's payment obligations under this paragraph 2 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including, without limitation: (i) any lack of validity, enforceability or legal effect of any Credit or this Agreement, or any term or provision therein or herein; (ii) payment against presentation of any draft, demand or claim for payment under any Credit or other document presented for purposes of drawing under any Credit (**"Drawing Document"**) that does not comply in whole or in part with the terms of the applicable Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person (or a transferee of such Person) purporting to be a successor or transferee of the beneficiary of such Credit; (iii) Bank or any of its branches or affiliates being the beneficiary of any Credit; (iv) Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Credit even if such Drawing Document claims an amount in excess of the amount available under the Credit; (v) the existence of any claim, set-off, defense or other right that Applicant or any other Person may have at any time against any beneficiary, any assignee of proceeds, Bank or any other Person; (vi) Bank or any correspondent having previously paid against fraudulently signed or presented Drawing Documents (whether or not Applicant reimbursed Bank for such drawing); and (vii) any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing, that might, but for this paragraph, constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, Applicant's obligations hereunder (whether against Bank, the beneficiary or any other Person); provided, however, that subject to paragraph 4 hereof, the foregoing shall not exculpate Bank from such liability to Applicant as may, be finally, judicially determined in an independent action or proceeding brought by Applicant against Bank following payment of Applicant's obligations under this Agreement. **"Person"** means any natural Person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

3. **Amendment; Waiver.** Bank shall not be deemed to have amended or modified any term hereof, or waived any of its rights unless Bank consents in writing to such amendment, modification or waiver. No such waiver, unless expressly stated therein, shall be effective as to any transaction which occurs subsequent to such waiver, nor as to any continuance of a breach after such waiver. Bank's consent to any amendment, waiver, or modification does not mean that Bank shall consent or has consented to any other or subsequent Instruction to amend, modify, or waive a term of this Agreement or any Credit.

4. **Indemnification; Limitation of Liability.** (a) Applicant shall indemnify and hold harmless Bank, its parent, and correspondents and each of their respective directors, officers, employees and agents (each, including Bank, an **"Indemnified Person"**) from and against any and all claims, suits, judgments, costs, losses, fines, penalties, damages, liabilities, and expenses, including expert witness fees and legal fees, charges and disbursements of any counsel (including in-house counsel fees and allocated costs) for any Indemnified Person (**"Costs"**), arising out of, in connection with, or as a result of: (i) any Credit or any pre-advice of its issuance; (ii) any transfer, sale, delivery, surrender, or endorsement of any Drawing Document at any time(s) held by any Indemnified Person in connection with any Credit; (iii) any action or proceeding arising out of or in connection with any Credit or this Agreement (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Credit, or for the wrongful dishonor of or honoring a presentation under any Credit; (iv) any independent undertakings issued by the beneficiary of any Credit; (v) any unauthorized Instruction or error in computer transmission; (vi) an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated; (vii) any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of letter of credit proceeds or holder of an instrument or document; (viii) the fraud, forgery or illegal action of parties other than the Indemnified Person; (ix) the enforcement of this Agreement or any rights or remedies under or in connection with this Agreement or any Credit; (x) the Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation; (xi) Bank dishonoring any presentation upon or during the continuance of any Event of Default or for which Applicant is unable or unwilling to make any payment to Bank required under paragraph 2 above; (xii) the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of such Indemnified Person; in each case, including that resulting from Bank's own negligence, provided, however, that such indemnity shall not be available to any Person claiming indemnification under (i) through (xii) above to the extent that such Costs are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Indemnified Person claiming indemnity. If and to the extent that the obligations of Applicant under this paragraph are unenforceable for any reason, Applicant shall make the maximum contribution to the Costs permissible under applicable law.

(b) The liability of Bank (or any other Indemnified Person) under, in connection with and/or arising out of this Agreement or any Credit (or any pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to any direct damages suffered by Applicant that are caused directly by Bank's gross negligence or willful misconduct in (i) honoring a presentation that does not at least substantially comply with a Credit, (ii) failing to honor a presentation that strictly complies with a Credit or (iii) retaining Drawing Documents presented under a Credit. In no event shall Bank be deemed to have failed to act with due diligence or reasonable care if Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement, including paragraph 4(c) below. Applicant's aggregate remedies against Bank and any Indemnified Person for wrongfully honoring a presentation under any Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Applicant to Bank in respect of the honored presentation in respect of such Credit under paragraph 2 above, plus interest. **Notwithstanding anything to the contrary herein, Bank and the other Indemnified Persons shall not, under any circumstances**

whatsoever, be liable for any punitive, consequential, indirect or special damages or losses regardless of whether Bank or any Indemnified Person shall have been advised of the possibility thereof or of the form of action in which such damages or losses may be claimed. Applicant shall take action to avoid and mitigate the amount of any damages claimed against Bank or any Indemnified Person, including by enforcing its rights in the underlying transaction. Any claim by Applicant for damages under or in connection with this Agreement or any Credit shall be reduced by an amount equal to the sum of (i) the amount saved by Applicant as a result of the breach or alleged wrongful conduct and (ii) the amount of the loss that would have been avoided had Applicant mitigated damages. If a Credit is to be governed by a law other than that of the State of New York, Bank shall not be liable for any Costs resulting from any act or omission by Bank in accord with the UCP or the ISP, as applicable, and Applicant shall indemnify Bank for all such Costs. "Standard Letter of Credit Practice" means, for Bank, any domestic or foreign law or letter of credit practices applicable in the city in which Bank issued the applicable Credit or for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Credit, as the case may be. Such practices shall be (i) of banks that regularly issue Credits in the particular city and (ii) required or permitted under the UCP or the ISP, as chosen in the applicable Credit. "ISP" means, International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adhered to by Bank on the date such Credit is issued. "UCP" means, Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adhered to by Bank on the date such Credit is issued.

(c) Without limiting any other provision of this Agreement, Bank and each other Indemnified Person (if applicable), shall not be responsible to Applicant for, and Bank's rights and remedies against Applicant and Applicant's obligation to reimburse the Bank shall not be impaired by: (i) honor of a presentation under any Credit which on its face substantially complies with the terms of such Credit; (ii) honor of a presentation of any Drawing Documents which appear on their face to have been signed, presented or issued (X) by any purported successor or transferee of any beneficiary or other party required to sign, present or issue the Drawing Documents or (Y) under a new name of the beneficiary; (iii) acceptance as a draft of any written or electronic demand or request for payment under a Credit, even if nonnegotiable or not in the form of a draft, and may disregard any requirement that such draft, demand or request bear any or adequate reference to the Credit; (iv) the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness, or legal effect of any presentation under any Credit or of any Drawing Documents; (v) disregard of any non-documentary conditions stated in any Credit; (vi) acting upon any Instruction which it, in Good Faith, believes to have been given by a Person or entity authorized to give such Instruction; (vii) any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation; (viii) any delay in giving or failing to give any notice; (ix) any acts, omissions or fraud by, or the solvency of, any beneficiary, any nominated Person or any other Person; (x) any breach of contract between the beneficiary and Applicant or any of the parties to the underlying transaction; (xi) assertion or waiver of any provision of the UCP or ISP which primarily benefits an issuer of a letter of credit, including, any requirement that any Drawing Document be presented to it at a particular hour or place; (xii) payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under the Standard Letter of Credit Practice applicable to it; (xiii) dishonor of any presentation upon or during any Event of Default or for which Applicant is unable or unwilling to reimburse or indemnify Bank (provided that Applicant acknowledges that if Bank shall later be required to honor the presentation, Applicant shall be liable therefore in accordance with paragraph 2 hereof); and (xiv) acting or failing to act as required or permitted under Standard Letter of Credit Practice (or in the case of other independent undertakings or guarantees, the UN Convention) applicable to where it has issued, confirmed, advised or negotiated such Credit, as the case may be. "Good Faith" means honesty in fact in the conduct of the transaction concerned. "UN Convention" means the United Nations Convention on Independent Guarantees and Standby Letters of Credit.

(d) Applicant shall notify Bank of (i) any noncompliance with any Instruction, any other irregularity with respect to the text of any Credit or any amendment thereto or any claim of an unauthorized, fraudulent or otherwise improper Instruction, within one (1) Business Day of Applicant's receipt of a copy of such Credit or amendment and (ii) any objection Applicant may have to Bank's honor or dishonor of any presentation under any Credit or any other action or inaction taken or proposed to be taken by Bank under or in connection with this Agreement or any Credit, within three (3) Business Days after Applicant receives notice of the objectionable action or inaction. The failure to so notify the Bank within said times shall discharge Bank from any loss or liability that Bank could have avoided or mitigated had it received such notice, to the extent that Bank could be held liable for damages hereunder; provided, that, if Applicant shall not provide such notice to Bank within three (3) Business Days of the date of receipt in the case of clause (i) or ten (10) Business Days from the date of receipt in the case of clause (ii), Bank shall have no liability whatsoever for such noncompliance, irregularity, action or inaction and Applicant shall be precluded from raising such noncompliance, irregularity or objection as a defense or claim against Bank. Applicant's acceptance or retention of a Drawing Document presented under or in connection with any Credit (whether or not the document is genuine) or of any Released Merchandise shall ratify Bank's honor of the presentation and preclude Applicant from raising a defense, set-off or claim with respect to Bank's honor of such Credit. Bank shall not be required to seek any waiver of discrepancies from Applicant or to grant any waiver of discrepancies which Applicant approves or requests. "Released Merchandise" means all Property referred to in or relating to the applicable Credit, released (including pursuant to a forwarders cargo receipt or by any other means whatsoever) or consigned to Applicant or any Person designated by Applicant in connection with such Credit. "Property" means all property of any kind whatsoever (now existing or hereafter acquired)

including, without limitation, any and all right, title and interest of Applicant in any goods, equipment, inventory, money, documents, letters of credit, warehouse receipts, instruments, securities, security entitlements, financial assets, investment property, precious and base metals, chattel paper, electronic chattel paper, accounts, commercial tort claims, deposit accounts, general intangibles (including any claims for breach of contract, breach of warranty claims and any insurance policies and proceeds), letter of credit rights, choses in action and the proceeds of any and all thereof (including any and all of the aforesaid referred to in any Credit or the Drawing Documents relating thereto).

(e) Applicant will (i) comply with all foreign and domestic laws, rules and regulations (including the USA Patriot Act, foreign exchange control regulations, foreign asset control regulations and other trade-related regulations) now or hereafter applicable to each Credit, the transactions underlying such Credit or Applicant's execution, delivery and performance of this Agreement, (ii) cause all Released Merchandise to be insured against theft, fire and such other risks usually insured against in connection with the underlying transaction; (iii) permit Bank (or its representatives) to inspect and audit any Property and Applicant's books and records with respect thereto upon reasonable notice; and (iv) to the extent not provided to Bank under other agreements, upon request, furnish Bank with Applicant's most recent year-end, quarterly and monthly (if any), financial statements (as audited) and such other information as Bank shall reasonably request regarding the financial condition, business or operations of Applicant. Further, the undersigned acknowledges and agrees to provide the Bank additional information, records, and documentation as requested by Bank, pursuant to the Bank's programs enacted to comply with Section 326 of the USA Patriot Act, the applicable regulations promulgated thereunder, and the Bank's Customer Identification Program and authorizes Bank to verify information as per the USA Patriot Act Regulation.

(f) Applicant acknowledges that this Agreement and each Credit is entered into (or will be entered into) for commercial purposes. To the extent that Applicant may now or hereafter be entitled, in any jurisdiction in which judicial proceedings may at any time be commenced with respect to this Agreement or any Credit, to claim for itself or its revenues or properties any immunity from the jurisdiction of any court or from legal process (whether from service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the extent that in any such jurisdiction there may be attributed to the Applicant any such immunity (whether or not claimed), Applicant hereby irrevocably agrees not to claim, and hereby waives, such immunity in respect of its obligations under this Agreement or any Credit.

5. **Representations and Warranties.** Applicant hereby represents and warrants as of the date of this Agreement (and with each Instruction for the issuance of a Credit represents and warrants as of the date of the Instruction) that: (a) it has all necessary power and authority to enter into and perform this Agreement; (b) it has obtained all authorizations, consents and approvals required for it to enter into and perform this Agreement in accordance with its terms; (c) this Agreement constitutes the legal, valid and binding obligation of Applicant, enforceable against it in accordance with its terms; (d) the execution, delivery and performance of this Agreement by Applicant does not and will not contravene (i) its charter, by-laws or other organizational documents, (ii) any order or writ binding on or affecting Applicant or its properties, or (iii) any agreement or arrangement to which Applicant is a party or by which it or its properties may otherwise be bound, the contravention of which agreement or arrangement would have a material adverse effect on Applicant; (e) the financial statements most recently furnished to Bank by Applicant fairly present the financial condition of Applicant in accordance with generally accepted accounting principles, and there has been no material adverse change in Applicant's business, condition (financial or otherwise) or results of operation since the date of Applicant's most recent annual financial statements; (f) no information now or hereafter furnished by Applicant to Bank in connection with this Agreement or any Credit is or shall be materially false or misleading when furnished; (g) there is no pending or threatened action which may materially adversely affect its financial condition or business or which purports to affect the validity or enforceability of this Agreement, any Credit or any transaction related to any Credit; and (h) Applicant is acting for itself and for no other Person or entity in requesting issuance of each Credit.

6. **Pledge and Assignment of Security.** (a) As security for the payment and performance of all obligations and liabilities of Applicant to Bank in respect of any and all Credits issued hereunder (if any) and under this Agreement, whether matured or unmatured, absolute or contingent, now existing or hereafter incurred **("Obligations")**, Applicant hereby grants to Bank a continuing lien and security interest in, and pledges and assigns to Bank all of Applicant's present and future right, title and interest in, to and under all of the following property (whether now existing or hereafter created or acquired): (i) the balance of all deposit accounts and all securities accounts with any office of Bank wherever located, ("Deposit Accounts" and "Securities Accounts", as the case may be), and any other claims of Applicant against Bank; (ii) all Property which has been or at any time shall be delivered to or otherwise come into the possession, custody or control of any office of Bank or any correspondent (which shall be deemed a collateral agent or a bailee of Bank for the purpose of perfecting a security interest in the Property) for any purpose, whether or not for the express purpose of being used by any such entity as collateral security or for safekeeping, custody, pledge, transmission or otherwise; (iii) all Property received or receivable by Bank or its correspondents under or in connection with each Credit; (iv) all Property received or receivable by Applicant in connection with the transaction underlying each Credit; (v) all present and future claims and rights of Applicant against any beneficiary of any Credit arising in connection with such Credit or the transaction underlying such Credit; and (vi) all products and proceeds of the foregoing (collectively, the **"Collateral"**).

(b) Applicant shall hold all payments of the Obligations and all proceeds of Collateral in trust for Bank. Bank shall be deemed to have possession, custody or control of all Collateral actually in transit to or set apart for it (or any of its agents, correspondents or others acting in its behalf), it being understood that the receipt at any time by Applicant (or any of its agents, correspondents, or others acting in its behalf), of Collateral of whatever nature, including cash, shall not be deemed a waiver of any of Bank's rights or powers.

(c) If at any time there shall occur and be continuing (i) any Event of Default, (ii) any material adverse change in the condition (financial or otherwise), business, operations or prospects of Applicant or any Person that has guaranteed or provided credit support for all or part of the Obligations ("**Guarantor**"), (iii) any action for a temporary restraining order, preliminary or permanent injunction, beneficiary wrongful dishonor action or the issuance or commencement of any similar order, action or event in connection with any Credit or any Drawing Document or this Agreement, which order, action or event may apply, directly or indirectly, to Bank or which otherwise threatens to extend or increase Bank's contingent liability beyond the time, amount or other limit provided in such Credit or this Agreement; or (iv) any other event or condition which provides a basis for Bank in good faith to deem itself insecure, **then,** Applicant shall, upon Bank's demand, deliver to Bank, as additional security for the Obligations, cash in an amount required by Bank.

(d) Bank is authorized to file financing statements, naming Applicant as debtor and Bank as secured party, with respect to any or all of the Collateral hereunder. Bank is authorized to take any action necessary to protect its rights in the Collateral. Applicant will, at its own expense upon request by Bank from time to time, sign any other instrument or document (including any security agreement, or control agreement) and take any other action Bank may reasonably deem necessary or desirable to preserve, perfect, protect or maintain the Collateral and the priority of Bank's security interest therein and to realize upon Bank's rights and remedies as a secured party. For the avoidance of doubt and not in limitation of the rights of Bank under Sections 9-104(a)(1), 9-106(a) and 8-106(e) of the Code as adopted by the State of New York, Applicant and Bank (acting as a bank with respect to all Deposit Accounts and as a securities intermediary with respect to all Securities Accounts) agree that Bank may direct disposition of the funds in any Deposit Account and may issue and follow its own entitlement orders with respect to any Securities Account, in either case without the consent of Applicant.

(e) To the extent Bank honors a presentation for which Bank remains unpaid, Bank may assert rights of Applicant and Applicant shall cooperate with Bank in its assertion of Applicant's rights against the beneficiary, the beneficiary's rights against Applicant and any other rights that Bank may have by subordination, subrogation, reimbursement, indemnity or assignment.

(f) If Bank shall agree to honor (accept) Drawing Documents under a Credit on a time draft or deferred payment basis, Applicant shall not take possession of the Drawing Documents or the underlying Property except for the purpose of loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with such Property in a manner preliminary to its sale or exchange. An Instruction to release any such Drawing Document or Property shall be deemed a representation by Applicant to Bank that Applicant seeks such release for one of said purposes. In each such case, Applicant immediately shall apply the sale proceeds of such Property to the Obligations relating to the applicable Credit.

7. **Events of Default; Obligations Due; Remedies.** (a) Each of the following shall be an "**Event of Default**" under this Agreement: (i) Applicant shall fail to pay any sum payable upon or in respect of any of the Obligations when due; (ii) Applicant shall fail to perform any agreement contained herein; (iii) Applicant or any Guarantor shall fail to pay any taxes when due and such taxes shall not be contested in good faith or the amount thereof reserved for in accordance with GAAP; (iv) there shall be commenced against Applicant or any Guarantor any proceeding for enforcement of a money judgment, which proceeding shall not have been stayed within ten (10) Business Days; (v) any statement made, or any information, report or Instruction furnished by or for Applicant to Bank contains any misstatement of a material fact or omits to state a material fact or any fact necessary to make any statement contained therein not materially misleading; (vi) the dissolution, termination or, if an individual, death of Applicant or a Guarantor; (vii) any indebtedness, obligation and/or liability of Applicant or a Guarantor to any Person, including but not limited to Bank, shall not be paid or performed when due or any event or condition shall occur that shall result in any indebtedness, obligation or liability becoming due prior to its scheduled maturity or settlement date or permits (with or without the giving of notice, the lapse of time or both) the holder of such indebtedness or obligee to cause such indebtedness, obligation or liability to become due, or to require the prepayment, repurchase, redemption or defeasance thereof prior to its scheduled maturity or settlement date; (viii) any Person shall contest the validity or enforceability of any guaranty supporting the Obligations; (ix) Applicant or any Guarantor shall become insolvent (however such insolvency may be evidenced or defined) or generally not be able to pay its debts as they become due, shall make a general assignment for the benefit of creditors, or shall suspend the transaction of its usual business or be expelled or suspended from any exchange, or if an application is made by any judgment creditor of Applicant or a Guarantor for any order directing Bank to pay over money or to deliver other property, or a petition in bankruptcy shall be filed by or against Applicant or a Guarantor or any proceeding shall be instituted by or against Applicant or a Guarantor for any relief under any bankruptcy or insolvency laws or any law relating to the relief of debtors, readjustment of indebtedness, reorganization, composition or extensions or if any governmental authority or any court at the instance of any governmental authority shall take possession of any substantial part of the property of Applicant or any Guarantor or shall assume control over the affairs or operations of Applicant or any Guarantor, or if a receiver or

custodian shall be appointed for, or a writ or order of attachment or garnishment shall be issued or made against, any of the property or assets of Applicant or a Guarantor or Applicant or a Guarantor shall indicate that any of the foregoing has occurred or will occur; or (x) there shall occur in one or a series of transactions (A) the sale or transfer of, or the creation or assertion of a lien over, a substantial portion of the assets of Applicant or of any Guarantor, (B) any transaction or event which results in the reduction in shareholder's equity (or partnership capital, net worth or similar equivalent term) of the Applicant or any Guarantor of 50% or more (measured against such equity as of the date hereof), (C) an acquisition, directly or indirectly, of the power to direct or cause the direction of the management or policies of Applicant (or any Guarantor), whether by means of contract, voting power or otherwise, or (D) the merger or consolidation of Applicant or any Guarantor.

(b) Upon an Event of Default, all of the Obligations shall be immediately due and payable without notice or demand (whether or not a drawing or claim had in fact been made or paid) and Bank may, in addition to all other rights and remedies it may have at law or in equity, (i) exercise any remedies of a secured party under applicable law, including under the Code, (ii) charge, debit and/or set-off against any general or special account of Applicant maintained at any office of Bank (whether matured or unmatured) for the amount of the Obligations, (iii) amend or terminate, or transfer drawing rights or cure one or more discrepancies under, any Credit, and/or (iv) make payment in satisfaction of the Obligations or hold all amounts, proceeds and Collateral as security for each Credit. Upon an Event of Default, Applicant shall assemble all Collateral and make it available to Bank at a place designated by Bank which is reasonably convenient to Bank and Applicant, and Bank shall be authorized to liquidate or sell immediately, without demand for payment, advertisement or notice to Applicant, all of which are hereby expressly waived (except such notice as is required by applicable law and cannot be waived, in which event such notice shall be deemed proper if mailed at least five Business Days before disposition or other action) any and all Collateral (whether received pursuant to paragraph 6(c) hereof or otherwise) at private sale or at public auction or at brokers' board or upon any exchange or otherwise, at Bank's option, in such parcels and at such time and at such place and at such price and upon such terms and conditions as Bank may deem proper, and to apply the net proceeds of such sale or sales, together with any balance of deposits and any sums credited by or due from Bank to Applicant in general account or otherwise, to the payment of any and all of the Obligations, all without prejudice to the rights of Bank against Applicant with respect to any and all amounts which may be or remain unpaid and if any such sale be at broker's board or public auction or upon any exchange Bank may itself be a purchaser at such sale, free from any right of redemption, which Applicant hereby expressly waives and releases.

8. **Continuing Rights and Obligations.** Bank's rights and liens hereunder shall continue unimpaired, and Applicant shall be and remain obligated in accordance with the terms and provisions hereof, notwithstanding the release and/or substitution of any Property which may be held as security hereunder at any time, or of any rights or interest therein. Applicant waives any defense whatsoever which might constitute a defense available to, or discharge of, a surety or a guarantor. If more than one Person signs this Agreement or an Application hereunder, each of them shall be jointly and severally liable hereunder and thereunder and all the terms and provisions regarding liabilities, obligations and Property of such Persons shall apply to any liabilities, obligations and Property of any and all of them.

9. **Electronic Transmissions.** Bank is authorized to accept and process any Application and any amendments, transfers, assignments of proceeds, Instructions, consents, waivers and all documents relating to the Credit or the Application which are sent to Bank by electronic transmission, including SWIFT, electronic mail, telex, telecopy, telefax, courier, mail or other computer generated telecommunications and such electronic communication shall have the same legal effect as if written and shall be binding upon and enforceable against the Applicant. Bank may, but shall not be obligated to, require authentication of such electronic transmission or that Bank receives original documents prior to acting on such electronic transmission. If it is a condition of the Credit that payment may be made upon receipt by Bank of an electronic transmission advising negotiation, Applicant hereby agrees to reimburse Bank on demand for the amount indicated in such electronic transmission advice, and further agrees to hold Bank harmless if the documents fail to arrive, or if, upon the arrival of the documents, Bank should determine that the documents do not comply with the terms and conditions of the Credit.

10. **Jurisdiction; Waiver of Jury Trial.** (a) Applicant submits to the nonexclusive jurisdiction of any state or federal court located in the Borough of Manhattan, City of New York, State of New York, for itself and its Property and agrees that any such court shall be a proper forum for any action or suit brought by Bank. Service of process in any legal action or proceeding arising out of or in connection with this Agreement, any Instruction or any Credit may be made upon Applicant by mailing a copy of the summons to Applicant either at the address set forth in the applicable Application or at Applicant's last address appearing in Bank's records. In addition, if Applicant is organized or incorporated in a jurisdiction outside the United States of America, Applicant designates the CT Corporation located at 111 8ᵗʰ Avenue, New York, New York 10011 as the true and lawful agent and attorney-in-fact of Applicant for receipt of the summons, writs and notices in connection with any such action or suit.

(b) No legal action or proceeding arising out of or in connection with this Agreement, any Instruction or any Credit may be brought by Applicant against Bank (i) except in a state or federal court located in the Borough of Manhattan, City of New York, State of New York and (ii) unless commenced within one (1) year after (X) the expiration date of the applicable Credit or (Y) the alleged breach shall have purportedly occurred, whichever is earlier.

(c) **APPLICANT WAIVES (I) THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION OR PROCEEDING IN WHICH BANK AND APPLICANT ARE PARTIES (WHETHER OR NOT THE ONLY PARTIES) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, ANY INSTRUCTION OR ANY CREDIT AND (II) THE RIGHT TO INTERPOSE ANY CLAIM, SETOFF OR COUNTERCLAIM OF ANY NATURE OR DESCRIPTION.**

11. **Applicable Law; Severability.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principles of conflict of laws. The UCP and the ISP are incorporated by reference into this Agreement and are evidence of Standard Letter of Credit Practice with respect to matters covered therein provided, however, that to the extent permitted by applicable law, this Agreement shall prevail in case of a conflict between this Agreement, the Uniform Commercial Code (the "**Code**"), and/or Standard Letter of Credit Practice and the UCP shall prevail in case of conflict between the UCP and the Code or other Standard Letter of Credit Practice if the Credit is a standby Credit governed by the UCP, and the ISP shall prevail in case of a conflict between the ISP and the Code and other Standard Letter of Credit Practice if the Credit is a standby Credit governed by the ISP. Any provisions of this Agreement which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12. **No Third Party Benefits; Successor; Assignment; Integration; Delivery by Facsimile; Notices.** This Agreement shall be binding upon and inure to the benefit of Bank and Applicant and their respective successors and permitted assigns. This Agreement shall not confer any right or benefit upon any Person other than the parties to this Agreement, the Indemnified Persons and their respective successors and permitted assigns. Bank may assign or sell participations in all or any part of any Credit or this Agreement to another entity and Bank may disseminate credit information relating to the Applicant in connection with any proposed participation. Applicant may not assign this Agreement without the prior written consent of Bank. This Agreement may be signed and delivered by facsimile transmission. Notices to Bank shall be sent to the address of Bank as set forth on the Credit and shall be delivered by hand, overnight courier or certified mail, return receipt requested. Notices to Applicant shall be sent to the address set forth below the signature line hereto. **THIS AGREEMENT CONSTITUTES THE ENTIRE CONTRACT AND FINAL AGREEMENT AMONG THE PARTIES RELATING TO THE SUBJECT MATTER AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

13. **Continuing Agreement.** This Agreement is a continuing agreement and may not be terminated by Applicant except upon (i) thirty (30) days' prior written notice of such termination by Applicant to Bank at the address of Bank set forth on the most recent Credit issued hereunder, (ii) payment of all Obligations and (iii) the expiration or cancellation of all Credits issued hereunder.
Notwithstanding the foregoing sentence, if a Credit is issued in favor of a sovereign or commercial entity, which is to issue a guarantee or undertaking on Applicant's behalf in connection therewith, or is issued as support for such a guarantee, the Applicant shall remain liable with respect to such Credit until Bank is fully released in writing by such entity.

14. **Survival.** The provisions of Sections 2, 4, 6, 10, 11 and 13 shall survive and remain in full force and effect regardless of the consummation of any transactions contemplated hereby, the reimbursement or repayment of any drawings or Obligations, the expiration or termination of the Credits or the termination of this Agreement or any provision hereof.

15. **Limitation of Interest and Other Charges.** Applicant and Bank intend to conform strictly to the applicable usury laws, if any, now or hereafter in force with respect to this Agreement. To such end: the aggregate of all interest and other charges constituting interest under such applicable usury laws and contracted for, chargeable or receivable under this Agreement shall never exceed the maximum amount of interest, nor produce a rate in excess of the maximum contract rate of interest, that Bank is authorized to charge Applicant under such applicable usury laws.

16. **MISCELLANEOUS.**

**Installments.** If the Credit is issued subject to UCP 500 or 600, unless otherwise agreed, in the event that any installment of the Credit is not drawn within the period allowed for that installment, the Credit may continue to be available for any subsequent installments in the sole discretion of the Bank, notwithstanding Article 41 of UCP 500 or Article 32 of UCP 600.

**Auto Extend Notice.** If the Credit provides for automatic extension without amendment, Applicant agrees that it will notify Bank in writing at least sixty (60) days prior to the last day specified in the Credit by which Bank must give notice of nonextension as to whether or not it wishes the Credit to be extended. Any decision to extend or not extend the Credit shall be in Bank's sole discretion and judgment. Applicant hereby acknowledges that in the event Bank notifies the beneficiary of the Credit that it has elected not to extend the Credit and the beneficiary draws on the Credit after receiving the notice of non-extension, Applicant acknowledges and agrees that Applicant shall have no claim or cause of action against Bank or defense against payment under the agreement for Bank's discretionary decision to extend or not extend the Credit.

**Pending Expiry Notice.** If a Credit's terms and conditions provide that Bank give beneficiary a notice of pending expiration, Applicant agrees that it will notify Bank in writing at least sixty (60) days prior to the last day specified in the Credit by which Bank

must give such notice of the pending expiration date. In the event Applicant fails to so notify Bank and the Credit is extended, Applicant's Obligations under this Agreement shall continue in effect and be binding on Applicant with regard to the Credit as so extended.

10      Archer Daniels Midland Company (Apv'd by GCM 1/4/2010)

THE UNDERSIGNED HEREBY AGREES TO ALL THE TERMS AND CONDITIONS SET FORTH HEREIN, ALL OF WHICH HAVE BEEN READ AND UNDERSTOOD BY THE UNDERSIGNED.

Archer Daniels Midland Company
(Applicant/Obligor)

(Authorized Signature)

Manager · Cash Resources
(Title)

217-451-8617
(Phone)

217-451-4128
(Fax)

8/26/10
(Date)

Without limiting the terms above, you are authorized to debit our account no.
with JPMorgan Chase Bank, N.A. for the amount of each drawing and/or your commissions and charges.

**THE FOLLOWING IS TO BE EXECUTED IF THE CREDIT IS TO BE ISSUED FOR THE ACCOUNT OF A PERSON OTHER THAN THE PERSON SIGNING ABOVE:**

**AUTHORIZATION AND AGREEMENT OF ADDITIONAL PARTY NAMED AS ACCOUNT PARTY**

To: THE ISSUER OF THE CREDIT

We join in the above Agreement, naming us as Account Party, for the issuance of the Credit and, in consideration thereof, we irrevocably agree (i) that the above Applicant has sole right to give instructions and make agreements with respect to this Application, the Agreement, the Credit and the disposition of documents, and we have no right or claim against you, any of your affiliates or subsidiaries, or any correspondent in respect of any matter arising in connection with any of the foregoing and (ii) to be bound by the Agreement and all obligations of the Applicant thereunder as if we were a party thereto. The Applicant is authorized to assign or transfer to you all or any part of any security held by the Applicant for our obligations arising in connection with this transaction and, upon any such assignment or transfer, you shall be vested with all powers and rights in respect of the security transferred or assigned to you and you may enforce your rights under this Agreement against us or our Property in accordance with the terms hereof.

ADM Rice Inc.
(Account Party)

(Authorized Signature)

Manager - Cash Resources
(Title)

217-451-8617
(Phone)

217-451-4128
(Fax)

8/26/10
(Date)

## Appendix A
### To the Application and Agreement for Irrevocable Standby Letter of Credit
(To be completed by Account Party/Applicant/Correspondent Bank)

This Appendix will remain in effect until further notice in writing is received by the JPMorgan Chase Bank, N.A. from the Account Party/Applicant/Correspondent Bank. Changes to this Appendix require a new Appendix A to be executed and delivered to JPMorgan Chase Bank, N.A.

A) In the event JPMorgan Chase Bank, N.A. issues or amends a Standby Letter of Credit ("Credit"), any one of the following individual(s) shall be authorized to sign on the behalf of:

ADM Rice Inc.
(Print Name of Account Party/Applicant/Correspondent Bank)

| Mary Roe | Manager of Cash Resources | | August 26, 2010 |
|---|---|---|---|
| (Printed Name) | (Title) | (Authorized Signature) | (Date) |

| Ronald Bandler | Asst. Treasurer | | August 26, 2010 |
|---|---|---|---|
| (Printed Name) | (Title) | (Authorized Signature) | (Date) |

B) In regards to Standby Letters of Credit ("Credit"), JPMorgan Chase Bank, N.A. may accept and rely on instructions including without limitation, (a) waiving of discrepancies, (b) mailings/returning documents, (c) changing Credit terms and conditions prior to issuance, and amendments to Credits which do not extend, increase or change the tenor of the draft(s) transmitted by the following authorized representatives of:

ADM Rice Inc.
(Print Name of Account Party/Applicant/Correspondent Bank)

| Mary Roe | Manager of Cash Resources | | August 26, 2010 |
|---|---|---|---|
| (Printed Name) | (Title) | (Authorized Signature) | (Date) |

| Ronald Bandler | Asst. Treasurer | | August 26, 2010 |
|---|---|---|---|
| (Printed Name) | (Title) | (Authorized Signature) | (Date) |

| | | | |
|---|---|---|---|
| (Printed Name) | (Title) | (Authorized Signature) | (Date) |

C) Signature Verification (To be completed by "Bank"):
The above individual(s) is/are authorized to execute and sign applications, amendments and instructions on behalf of the Account Party/Applicant/Correspondent Bank.

| | | | |
|---|---|---|---|
| (Print Relationship Manager "RM" Name) | ("RM" Title) | ("RM" Authorized Signature) | (Date) |

12 Archer Daniels Midland Company (Apv'd by GCM 1/4/2010)

**PERFORMANCE BOND WORDING:**

Please very urgently issue under our risk and responsibility your Performance Bond for an amount of $6,926,850.00 (Six Million Nine Hundred Twenty Six Thousand Eight Hundred Fifty United States Dollars) for account of ADM Rice, Inc. 660 White Plains Rd, Tarrytown, N.Y. 10591, in favor of Ministry of Trade/Grain Board of Iraq valid until March 1, 2011 covering 120,000 metric tons plus or minus five percent of U.S. Rice under contract number MOT/GB/R5/4/2010.

PLEASE SEND ORIGINAL PERFORMANCE BOND DIRECTLY TO GRAIN BOARD OF IRAQ. PLEASE SEND A COPY OF THE BOND VIA EMAIL TO ADMRICE@ADM.COM.

Please issue the following text:

QUOTE
We, The Trade Bank of Iraq, are issuing this Performance Bond to you Ministry of Trade/Grain Board of Iraq in connection with the contract number MOT/GB/R5/4/2010 (the "Contract") between you and ADM Rice, Inc. 660 White Plains Rd, Tarrytown, N.Y. 10591 (the "Customer") relating to the sale by ADM Rice of 120,000 metric tons plus or minus five percent of U.S. Rice on C&F basis and whereas the Contract contains an obligation on your Customer to provide a Performance Bond in the amount of $6,926,850.00 (Six Million Nine Hundred Twenty Six Thousand Eight Hundred Fifty United States Dollars) (the "Performance Bond").

All claims made under this performance bond must be accompanied by an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications.

We hereby guarantee to pay to the Development Fund for Iraq, for your account, such amount as you may claim from us hereunder upon presentation of your first written demand at our counters to be signed by your authorized signatory specifying the amount claimed hereunder, certifying that the Customer has failed to fulfill its obligations to you and a detailed explanation of such failure to comply with the contract, and accompanied by the SGS original laboratory report as stated above. Accordingly you are entitled to receive payment under the Performance Bond, provided that:

1. Only one demand may be made here under prior the Expiry Date (as defined below).

2. The payment of any claim be made on first demand regardless of any contestation between the parties concerned.

3. We confirm that the necessary approval of the Foreign Exchange Authorities has been already obtained for issuing this Performance Bond.

4. The payment of any claim should be made according to the prevailing exchange rate at the actual date of payment.

5. In case of dispute, the Performance Bond is subject to Iraqi law.

6. This Performance Bond is not subject to any conditions other than those conditions stated above.

Let it be known that this Performance Bond being solely in your favor as beneficiary's is not assignable or transferable to any third parry, likewise it is not transferable by the principal to any other beneficiary or third party whom so ever is not permissible, as same being personal to all parties concerned.

By this present Performance Bond, we undertake to pay to you any amount or claim not exceeding under any circumstances the above mentioned amount, provided the claim falls within the direct scope of the matter to be indemnified and is irrelevant to any matter even if these matters resulting from the subject to be indemnified or relevant there to, when particular to any party, whatsoever its origin, since this Performance Bond is in your favor as the sole beneficiary's and subject to our receipt of you claim in this office not later than the official closing time in Baghdad of the 1st day of March in the year 2011 (Expiry Date) otherwise should we not receive any claim from you by that date our liability will cease and the present Performance Bond will become null and void and it will be removed from our records.

In any event or for any reason our maximum liability under this Performance Bond will not exceed the sum to be indemnified shown here above.

Yours faithfully,


AUTHORIZED SIGNATURE

UNQUOTE

**STANDBY LETTER OF CREDIT WORDING TO JP MORGAN CHASE:**

Delivery Instructions:

In consideration of you issuing your Performance Bond as requested above we hereby open in your favor our irrevocable Standby Letter of Credit number (insert LC # ) for an amount of $6,926,850.00 (Six Million Nine Hundred Twenty Six Thousand Eight Hundred Fifty United States Dollars) covering the applicant's obligations under contract

number MOT/GB/R5/4/2010, available against your authenticated SWIFT/ Tested Telex that you have duly issued your Performance Bond as requested by ourselves and that you have received a claim in accordance with the terms of the Performance Bond. This Standby Letter of Credit expires on March 15, 2011 and is subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision) International Chamber of Commerce Publication No. 600 and any amendments thereto and revisions thereof

In the event of a drawing under this Performance Bond our maximum aggregate liability is restricted to $6,926,850.00 (Six Million Nine Hundred Twenty Six Thousand Eight Hundred Fifty United States Dollars).

We undertake to pay to the Development Fund for Iraq, for account of Trade Bank of Iraq on your first authenticated SWIFT/ Tested Telex demand, any amount that you may claim not exceeding the total value of the said Bond provided that such demand is in accordance with the Performance Bond.

# EXHIBIT C

# JPMorganChase 🟊

JPMorgan Chase Bank, N.A.
Global Trade Services
300 South Riverside Plaza
Mail Code IL1-0236
Chicago, IL 60606-0236

AUG. 27, 2010
OUR L/C NO.: TFTS-868801

MESSAGE SENT TO:                        APPLICANT:
TRADE BANK OF IRAQ                      ADM RICE, INC.
CENTRAL BANK BLDG.                      660 WHITE PLAINS ROAD
RASHEED ST., 4TH FL.                    TARRYTOWN, NY 10591
BAGHDAD, IRAQ

FOLLOWING IS THE TEXT OF A S.W.I.F.T. MESSAGE SENT TO THE PARTY INDICATED
ABOVE:

*********************

DOCUMENTARY CREDIT NUMBER:    TFTS-868801

FURTHER IDENTIFICATION:       REQUEST

DATE OF ISSUE:                AUGUST 27, 2010

DETAILS:

WE HAVE ESTABLISHED OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR FAVOR
AS DETAILED HEREIN SUBJECT TO UCP LATEST VERSION


BENEFICIARY:                  TRADE BANK OF IRAQ
                              CENTRAL BANK BLDG.
                              RASHEED ST., 4TH FL.
                              BAGHDAD, IRAQ

APPLICANT:                    ADM RICE, INC.
                              660 WHITE PLAINS ROAD
                              TARRYTOWN, NY 10591

DATE AND PLACE OF EXPIRY:     MARCH 15, 2011
                              AT OUR COUNTER

DOCUMENTARY CREDIT AMOUNT:    USD6,926,850.00

AVAILABLE WITH:               JPMORGAN CHASE BANK, N.A.

(5112) Andrew J Kosik

Page 1 of 6

# JPMorganChase

JPMorgan Chase Bank, N.A.
Global Trade Services
300 South Riverside Plaza
Mail Code ILl-0236
Chicago, IL 60606-0236

AUG 27, 2010
OUR L/C NO.: TFTS-868801

MESSAGE SENT TO:                    APPLICANT:
TRADE BANK OF IRAQ                  ADM RICE, INC.
CENTRAL BANK BLDG,                  660 WHITE PLAINS ROAD
RASHEED ST., 4TH FL.                TARRYTOWN, NY 10591
BAGHDAD, IRAQ

                    TAMPA, FLORIDA
                    BY PAYMENT

ADDITIONAL DETAILS:
IN CONSIDERATION OF YOU ISSUING YOUR PERFORMANCE BOND AS REQUESTED BELOW
WE HEREBY OPEN IN YOUR FAVOR OUR IRREVOCABLE STANDBY LETTER OF CREDIT
NUMBER TFTS-868801 FOR AN AMOUNT OF USD6,926,850.00 (SIX MILLION NINE
HUNDRED TWENTY SIX THOUSAND EIGHT HUNDRED FIFTY AND 00/100 UNITED STATES
DOLLARS) COVERING THE APPLICANT'S OBLIGATIONS UNDER CONTRACT NUMBER
MOT/GB/R574/2010, AVAILABLE AGAINST YOUR AUTHENTICATED SWIFT THAT YOU HAVE
DULY ISSUED YOUR PERFORMANCE BOND AS REQUESTED BY OURSELVES AND THAT YOU
HAVE RECEIVED A CLAIM IN ACCORDANCE WITH THE TERMS OF THE PERFORMANCE
BOND.

THIS STANDBY LETTER OF CREDIT EXPIRES ON MARCH 15, 2011 AND IS SUBJECT TO
THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (2007 REVISION)
INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 600 AND ANY AMENDMENTS
THERETO AND REVISIONS THEREOF

IN THE EVENT OF A DRAWING UNDER THIS PERFORMANCE BOND OUR MAXIMUM
AGGREGATE LIABILITY IS RESTRICTED TO USD6,926,850.00 (SIX MILLION NINE
HUNDRED TWENTY SIX THOUSAND EIGHT HUNDRED FIFTY AND 00/100 UNITED STATES
DOLLARS).

WE UNDERTAKE TO PAY TO THE DEVELOPMENT FUND FOR IRAQ, FOR ACCOUNT OF TRADE
BANK OF IRAQ ON YOUR FIRST AUTHENTICATED SWIFT DEMAND, ANY AMOUNT THAT YOU
MAY CLAIM NOT EXCEEDING THE TOTAL VALUE OF THE SAID BOND PROVIDED THAT
SUCH DEMAND IS IN ACCORDANCE WITH THE PERFORMANCE BOND.

PLEASE VERY URGENTLY ISSUE, UNDER OUR RISK AND RESPONSIBILITY, YOUR
PERFORMANCE BOND FOR AN AMOUNT OF USD6,926,850.00 (SIX MILLION NINE
HUNDRED TWENTY SIX THOUSAND EIGHT HUNDRED FIFTY AND 00/100 UNITED STATES

(5112) Andrew J Kosik

## JPMorganChase ⬡

JPMorgan Chase Bank, N.A.
Global Trade Services
300 South Riverside Plaza
Mail Code IL1-0236
Chicago, IL 60606-0236

AUG. 27, 2010
OUR L/C NO.: TFTS-868801

MESSAGE SENT TO:                    APPLICANT:
TRADE BANK OF IRAQ                  ADM RICE, INC.
CENTRAL BANK BLDG.                  660 WHITE PLAINS ROAD
RASHEED ST., 4TH FL.                TARRYTOWN, NY 10591
BAGHDAD, IRAQ

DOLLARS) FOR THE ACCOUNT OF ADM RICE, INC., 660 WHITE PLAINS ROAD,
TARRYTOWN, NY 10591, IN FAVOR OF MINISTRY OF TRADE/GRAIN BOARD OF IRAQ
VALID UNTIL MARCH 1, 2011 COVERING CONTRACT NUMBER MOT/GB/R5/4/2010.

MULTIPLE DRAWINGS ARE PROHIBITED.

ALL BANKING CHARGES ARE FOR THE ACCOUNT OF THE APPLICANT.

UPON ISSUANCE OF YOUR PERFORMANCE BOND, PLEASE URGENTLY PROVIDE THE
REFERENCE NUMBER AND DATE OF ISSUANCE BY SWIFT AND CONFIRM THAT YOU HAVE
EITHER MAILED OR FAXED A COPY OF THE PERFORMANCE BOND TO US AT JPMORGAN
CHASE BANK, N.A., C/O JPMORGAN TREASURY SERVICES, ATTN: STANDBY LETTER OF
CREDIT DEPT., 10420 HIGHLAND MANOR DRIVE, 4TH FLOOR, TAMPA, FLORIDA 33610
FAX NUMBER 1-813-432-5161.

IN CONSIDERATION OF THIS STANDBY LETTER OF CREDIT IN YOUR FAVOR AND AT THE
REQUEST OF THE ABOVE NAMED APPLICANT, PLEASE ISSUE YOUR GUARANTEE AS
FOLLOWS IN FAVOR OF :

GUARANTEE BENEFICIARY:              MINISTRY OF TRADE/GRAIN BOARD
                                    OF IRAQ
                                    P.O. BOX 329
                                    BAGHDAD, IRAQ

GUARANTEE EXPIRY DATE:              MARCH 1, 2011

GUARANTEE TEXT:
WE, THE TRADE BANK OF IRAQ, ARE ISSUING THIS PERFORMANCE BOND TO YOU,
MINISTRY OF TRADE/GRAIN BOARD OF IRAQ IN CONNECTION WITH THE CONTRACT
NUMBER MOT/GB/R5/4/2010 (THE ''CONTRACT'') BETWEEN YOU AND ADM RICE, INC.
660 WHITE PLAINS RD, TARRYTOWN, N.Y. 10591 (THE ''CUSTOMER'') RELATING TO
THE SALE BY ADM RICE OF 120,000 METRIC TONS PLUS OR MINUS FIVE PERCENT OF

151121 Andrew J Kozik

# JPMorganChase

JPMorgan Chase Bank, N.A.
Global Trade Services
300 South Riverside Plaza
Mail Code IL1-0236
Chicago, IL 60606-0236

AUG 27, 2010
OUR L/C NO.: TFTS-868801

MESSAGE SENT TO:                    APPLICANT:
TRADE BANK OF IRAQ                  ADM RICE, INC.
CENTRAL BANK BLDG.                  660 WHITE PLAINS ROAD
RASHEED ST., 4TH FL.                TARRYTOWN, NY 10591
BAGHDAD, IRAQ

U.S. RICE ON C AND F BASIS AND WHEREAS THE CONTRACT CONTAINS AN OBLIGATION
ON YOUR CUSTOMER TO PROVIDE A PERFORMANCE BOND IN THE AMOUNT OF
USD6,926,850.00 (SIX MILLION NINE HUNDRED TWENTY SIX THOUSAND EIGHT
HUNDRED FIETY AND 00/100 UNITED STATES DOLLARS) (THE ''PERFORMANCE
BOND'').

ALL CLAIMS MADE UNDER THIS PERFORMANCE BOND MUST BE ACCOMPANIED BY AN SGS
ORIGINAL LABORATORY REPORT SPECIFICALLY CERTIFYING THAT THE QUALITY OF THE
PURCHASED COMMODITY DOES NOT MEET THE CONTRACTUAL SPECIFICATIONS.

WE HEREBY GUARANTEE TO PAY TO THE DEVELOPMENT FUND FOR IRAQ, FOR YOUR
ACCOUNT, SUCH AMOUNT AS YOU MAY CLAIM FROM US HEREUNDER UPON PRESENTATION
OF YOUR FIRST WRITTEN DEMAND AT OUR COUNTERS TO BE SIGNED BY YOUR
AUTHORIZED SIGNATORY SPECIFYING THE AMOUNT CLAIMED HEREUNDER, CERTIFYING
THAT THE CUSTOMER HAS FAILED TO FULFILL ITS OBLIGATIONS TO YOU AND A
DETAILED EXPLANATION OF SUCH FAILURE TO COMPLY WITH THE CONTRACT, AND
ACCOMPANIED BY THE SGS ORIGINAL LABORATORY REPORT AS STATED ABOVE.
ACCORDINGLY YOU ARE ENTITLED TO RECEIVE PAYMENT UNDER THE PERFORMANCE
BOND, PROVIDED THAT:

1. ONLY ONE DEMAND MAY BE MADE HERE UNDER PRIOR THE EXPIRY DATE (AS
DEFINED BELOW).

2. THE PAYMENT OF ANY CLAIM BE MADE ON FIRST DEMAND REGARDLESS OF ANY
CONTESTATION BETWEEN THE PARTIES CONCERNED.

3. WE CONFIRM THAT THE NECESSARY APPROVAL OF THE FOREIGN EXCHANGE
AUTHORITIES HAS BEEN ALREADY OBTAINED FOR ISSUING THIS PERFORMANCE BOND.

4. THE PAYMENT OF ANY CLAIM SHOULD BE MADE ACCORDING TO THE PREVAILING
EXCHANGE RATE AT THE ACTUAL DATE OF PAYMENT.

TSI121 Andrew J Kasik

# JPMorganChase ⬡

JPMorgan Chase Bank, N.A.
Global Trade Services
300 South Riverside Plaza
Mail Code IL1-0236
Chicago, IL 60606-0236

AUG 27, 2010
OUR L/C NO.: TFTS-868801

MESSAGE SENT TO:                    APPLICANT:
TRADE BANK OF IRAQ                  ADM RICE, INC.
CENTRAL BANK BLDG.                  660 WHITE PLAINS ROAD
RASHEED ST., 4TH FL.                TARRYTOWN, NY 10591
BAGHDAD, IRAQ

5. IN CASE OF DISPUTE, THE PERFORMANCE BOND IS SUBJECT TO IRAQI LAW.

6. THIS PERFORMANCE BOND IS NOT SUBJECT TO ANY CONDITIONS OTHER THAN THOSE
CONDITIONS STATED ABOVE.

LET IT BE KNOWN THAT THIS PERFORMANCE BOND BEING SOLELY IN YOUR FAVOR AS
BENEFICIARY'S IS NOT ASSIGNABLE OR TRANSFERABLE TO ANY THIRD PARRY,
LIKEWISE IT IS NOT TRANSFERABLE BY THE PRINCIPAL TO ANY OTHER BENEFICIARY
OR THIRD PARTY WHOM SO EVER IS NOT PERMISSIBLE, AS SAME BEING PERSONAL TO
ALL PARTIES CONCERNED.

BY THIS PRESENT PERFORMANCE BOND, WE UNDERTAKE TO PAY TO YOU ANY AMOUNT OR
CLAIM NOT EXCEEDING UNDER ANY CIRCUMSTANCES THE ABOVE MENTIONED AMOUNT,
PROVIDED THE CLAIM FALLS WITHIN THE DIRECT SCOPE OF THE MATTER TO BE
INDEMNIFIED AND IS IRRELEVANT TO ANY MATTER EVEN IF THESE MATTERS
RESULTING FROM THE SUBJECT TO BE INDEMNIFIED OR RELEVANT THERE TO, WHEN
PARTICULAR TO ANY PARTY, WHATSOEVER ITS ORIGIN, SINCE THIS PERFORMANCE
BOND IS IN YOUR
FAVOR AS THE SOLE BENEFICIARY'S AND SUBJECT TO OUR RECEIPT OF YOU CLAIM IN
THIS OFFICE NOT LATER THAN THE OFFICIAL CLOSING TIME IN BAGHDAD OF THE 1ST
DAY OF MARCH IN THE YEAR 2011 (THE ''EXPIRY DATE'') OTHERWISE SHOULD WE
NOT RECEIVE ANY CLAIM FROM YOU BY THAT DATE OUR LIABILITY WILL CEASE AND
THE PRESENT PERFORMANCE BOND WILL BECOME NULL AND VOID AND IT WILL BE
REMOVED FROM OUR RECORDS.

IN ANY EVENT OR FOR ANY REASON OUR MAXIMUM LIABILITY UNDER THIS
PERFORMANCE BOND WILL NOT EXCEED THE SUM TO BE INDEMNIFIED SHOWN HERE
ABOVE.

YOURS FAITHFULLY,

AUTHORIZED SIGNATURE

151121 Andrew J.Kisik

# JPMorganChase ⬡

JPMorgan Chase Bank, N.A.
Global Trade Services
300 South Riverside Plaza
Mail Code IL1-0236
Chicago, IL 60606-0236

AUG 27, 2010
OUR L/C NO. : TFTS-868801

MESSAGE SENT TO:
TRADE BANK OF IRAQ
CENTRAL BANK BLDG.
RASHEED ST., 4TH FL.
BAGHDAD, IRAQ

APPLICANT:
ADM RICE, INC.
660 WHITE PLAINS ROAD
TARRYTOWN, NY 10591

SPECIAL INSTRUCTIONS FOR TRADE BANK OF IRAQ:
PLEASE SEND THE ORIGINAL GUARANTEE DIRECTLY TO THE GRAIN BOARD OF IRAQ AND
SEND A COPY VIA E-MAIL TO: ADMRICE(AT)ADM.COM



15I12I Andrew J Kosik

## JPMorganChase ◆

JPMorgan Chase Bank, N.A.
Global Trade Services
300 South Riverside Plaza
Mail Code IL1-0236
Chicago, IL 60606-0236

AUG 30, 2010
OUR L/C NO.: TFTS-868801
AMENDMENT NO.: 1

MESSAGE SENT TO:                    APPLICANT:
TRADE BANK OF IRAQ                  ADM RICE, INC.
CENTRAL BANK BLDG.                  660 WHITE PLAINS ROAD
RASHEED ST., 4TH FL.                TARRYTOWN, NY 10591
BAGHDAD, IRAQ

FOLLOWING IS THE TEXT OF A S.W.I.F.T. MESSAGE SENT TO THE PARTY INDICATED
ABOVE:

********************

SENDER REFERENCE:            TFTS-868801

RECEIVER'S REFERENCE:        NONREF

NUMBER OF AMENDMENT:         1

ALL OTHER TERMS AND CONDITIONS OF THE CREDIT REMAIN UNCHANGED.

ADDITIONAL GUARANTEE TEXT
PLEASE CHANGE 'C AND F' TO READ 'CIF' WHEREVER IT MAY APPEAR.

073102 Andrew J Kosik

# EXHIBIT D





TRADE BANK OF IRAQ

# TRADE BANK OF IRAQ
### 608, Al-Yarmouk District, St. No, 1, Building No. 20
### Baghdad - Iraq

MINISTRY OF TRADE
GRAIN BOARD OF IRAQ
BAGHDAD - IRAQ

| | |
|---|---|
| Guarantee No | IGT1011517DRE |
| Type | Performance Guarantee |
| Amount | USD 6,926,850.00 |
| Issue date | 2/9/2010 |
| Expiry Date | 1/3/2011 |
| Purpose (contract details) | RELATING TO THE SALE BY ADM RICE OF 120,000 METRIC TONS PLUS OR MINUS FIVE PERCENT OF U. S. RICE ON CIF BASIS CONTRACT NO. MOT/GB/ R5/ 4/2010 |
| Applicant (name & address) | ADM RICE, INC. 660 WHITE PLAINS ROAD,TARRYTOWN, NY 10591 |

We, Trade Bank of Iraq, are issuing this Performance Bond to you MINISTRY OF TRADE GRAIN BOARD OF IRAQ in connection with the contract Number MOT/GB/ R5/ 4/2010 (the Contract") between you and ADM RICE, INC. 660 WHITE PLAINS RD,TARRYTOWN, NY 10591 (the customer) relating to THE SALE BY ADM RICE OF 120,000 METRIC TONS PLUS OR MINUS FIVE PERCENT OF U. S. RICE ON CIF BASIS and whereas the Contract contains an obligation on your Customer to provide a Performance Bond in the amount of USD 6,926,850.00 (Six Million Nine Hundred Twenty Six Thousand Eight Hundred Fifty US Dollar) (the "Performance Bond") .
All claims made under this performance bond must be accompanied by an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications.
We hereby guarantee to pay to The Development Fund for Iraq, for your account , such amount as you may claim from us hereunder upon presentation of your first written demand at our counters purporting to be signed by your authorised signatory specifying the amount claimed hereunder, certifying that the Customer has failed to fulfill their obligations to you and a detailed explanation of such failure to comply with the contract, and accompanied by the SGS original laboratory report as stated above. Accordingly you are entitled to receive payment under the Performance Bond provided that:
a) only one demand may be made hereunder prior to the expiry date (as defined below);



b) the payment of any claim should be made on first demand regardless of any contestation between the parties concerned.

c) we confirm to you that the necessary approval of the foreign exchange authorities has been already obtained for issuing this performance bond.

d) Wherever applicable the payment of any claim should be made according to the prevailing exchange rate at the actual date of payment.

e) in case of dispute, this performance bond is subject to Iraqi law.

f) this performance bond is not subject to any conditions other than those conditions stated above;

Let it be known that this Performance Bond being solely in your favour as Beneficiary and is not assignable or transferable to any third party. Likewise it is not transferable by the principal to any other beneficiary or third party whosoever is not permissible, as same being personal to all parties concerned.

By this Performance Bond, we undertake to pay to you any amount or claim not exceeding under any circumstances the above mentioned amount, provided the claim falls within the direct scope of the matter to be indemnified and is irrelevant to any other matter even if these matters resulting from the subject to be indemnified or relevant thereto, when particular to any party, whatsoever its origin, since this Performance Bond is in your favour as the sole Beneficiary and subject to our receipt of your claim in this office not later than the official closing time in Baghdad of the 1st day of March in the year 2011 (the expiry date) otherwise should we not receive any claim from you by that date our liability will cease and the present Performance Bond will become null and void and it will be removed from our records.

In any event or for any reason our maximum liabilities under this Performance Bond will not exceed the sum to be indemnified shown here above.

Yours faithfully,

RAJAA IBRAHIM AHMED
B12

HUSSAM SIRRI
A16

# EXHIBIT E

## JPMorganChase

JPMorgan Chase Bank, N.A.
Global Trade Services
300 South Riverside Plaza
Mail Code IL1-0236
Chicago, IL 60606-0236

SEP 10, 2010

L/C NO.: TFTS-868801                ITEM NO: 0005


TO;
ARCHER DANIELS MIDLAND CO.
ATTN:SHANNON NAIL
4666 FARIES PARKWAY
DECATUR, IL 62526

RE: TFTS-868801

ENCLOSED PLEASE FIND A COPY OF TRADE BANK OF IRAQ.'S GUARANTEE NO.
IGT1011517DRE IN FAVOR OF MINISTRY OF TRADE IN THE AMOUNT OF
USD6,926,850.00 BACKED BY OUR STANDBY LETTER OF CREDIT NUMBER: TFTS-868801.

REGARDS,
STANDBY LETTER OF CREDIT DEPARTMENT
JPMORGAN CHASE BANK, N.A.

141820 Andrew J Kosik





### TRADE BANK OF IRAQ

608, Al-Yarmouk District, St. No. 1, Building No. 20
Baghdad - Iraq

MINISTRY OF TRADE
GRAIN BOARD OF IRAQ
BAGHDAD - IRAQ

| | |
|---|---|
| Guarantee No | IGT1011517DRE |
| Type | Performance Guarantee |
| Amount | USD 6,926,850.00 |
| Issue date | 2/9/2010 |
| Expiry Date | 1/3/2011 |
| Purpose (contract details) | RELATING TO THE SALE BY ADM RICE OF 120,000 METRIC TONS PLUS OR MINUS FIVE PERCENT OF U. S. RICE ON CIF BASIS CONTRACT NO. MOT/GB/ R5/ 4/2010 |
| Applicant (name & address) | ADM RICE, INC. 660 WHITE PLAINS ROAD,TARRYTOWN, NY 10591 |

We, Trade Bank of Iraq, are issuing this Performance Bond to you MINISTRY OF TRADE GRAIN BOARD OF IRAQ in connection with the contract Number MOT/GB/ R5/ 4/2010 (the Contract") between you and ADM RICE, INC. 660 WHITE PLAINS RD,TARRYTOWN, NY 10591 (the customer) relating to THE SALE BY ADM RICE OF 120,000 METRIC TONS PLUS OR MINUS FIVE PERCENT OF U. S. RICE ON CIF BASIS and whereas the Contract contains an obligation on your Customer to provide a Performance Bond in the amount of USD 6,926,850.00 (Six Million Nine Hundred Twenty Six Thousand Eight Hundred Fifty US Dollar) (the "Performance Bond") .

All claims made under this performance bond must be accompanied by an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications.

We hereby guarantee to pay to The Development Fund for Iraq, for your account , such amount as you may claim from us hereunder upon presentation of your first written demand at our counters purporting to be signed by your authorised signatory specifying the amount claimed hereunder, certifying that the Customer has failed to fulfill their obligations to you and a detailed explanation of such failure to comply with the contract, and accompanied by the SGS original laboratory report as stated above. Accordingly you are entitled to receive payment under the Performance Bond provided that:

a) only one demand may be made hereunder prior to the expiry date (as defined below);



b) the payment of any claim should be made on first demand regardless of any contestation between the parties concerned.

c) we confirm to you that the necessary approval of the foreign exchange authorities has been already obtained for issuing this performance bond.

d) Wherever applicable the payment of any claim should be made according to the prevailing exchange rate at the actual date of payment.

e) in case of dispute, this performance bond is subject to Iraqi law.

f) this performance bond is not subject to any conditions other than those conditions stated above;

Let it be known that this Performance Bond being solely in your favour as Beneficiary and is not assignable or transferable to any third party. Likewise it is not transferable by the principal to any other beneficiary or third party whosoever is not permissible, as same being personal to all parties concerned.

By this Performance Bond, we undertake to pay to you any amount or claim not exceeding under any circumstances the above mentioned amount, provided the claim falls within the direct scope of the matter to be indemnified and is irrelevant to any other matter even if these matters resulting from the subject to be indemnified or relevant thereto, when particular to any party, whatsoever its origin, since this Performance Bond is in your favour as the sole Beneficiary and subject to our receipt of your claim in this office not later than the official closing time in Baghdad of the 1st day of March in the year 2011 (the expiry date) otherwise should we not receive any claim from you by that date our liability will cease and the present Performance Bond will become null and void and it will be removed from our records.

In any event or for any reason our maximum liabilities under this Performance Bond will not exceed the sum to be indemnified shown here above.

Yours faithfully,

RAJAA IBRAHIM AHMED
B12

HUSSAM SIRRI
A16

# EXHIBIT F

# MINISTRY OF TRADE
# GRAIN BOARD OF IRAQ

### RICE CONTRACT FOR SUPPLY 120000 MT
### + - 5% OF USA RICE

CONTRACT NO. : MOT/ GB/R 5 / 4 /2010
date:     6 : 9 /2010

THE REPUBLIC OF IRAQ / MINISTRY OF TRADE /
GRAIN BOARD OF IRAQ ( HEREINAFTER CALLED
THE BUYER) AND ADM RICE, INC ( HEREINAFTER
CALLED THE SELLER ) HAVE MUTUALLY AGREED
ON THE FOLLOWING :-

FIRST PARTY :   ( BUYER ) MINISTRY OF
TRADE/GRAIN BOARD OF IRAQ

    E-MAIL :
    import1@iqgrainb.com
    import2@iqgrainb.com
    import3@iqgrainb.com
    irac_grain@hotmail.com

SECOND PARTY: ( SELLER ) :

ADM RICE , INC
660 WHITE PLAINS RD
NEW YORK, N.Y. 10591
TEL : 914-366-7125
FAX : 914-366-7137
EMAIL : < admrice@admworld.com >

I. QUANTITY & SPECIFICATION :

A-  QUANTITY  :
    120000 MTS ( ONE HUNDRED TWENTY
THOUSAND MT ) + - 5% shipping tolerance .

    B-  SPECIFICATION :

    long grain milled rice with the following
    specifications

1-Fit for Human Consumption at final destination (
discharge ports ) and are consumed in the country of
origin .

2-Moisture- up to 14% maximum(up to 15% allowed
with penalty 1=1 basis of contract price)

<div dir="rtl">

وزارة التجارة
الشركة العامة لتجارة الحبوب

عقد تجهيز كمية ١٢٠ الف طن + – ٥% رز امريكي

العقد المرقم :– MOT/ GB/RS /4 /2010

تاريخـــة :– ٦–٩/ ٢٠١٠

اتفق الطرفان ' الجمهورية العراقية/وزارة التجارة/الشركة العامة لتجارة
الحبوب' الطرف المشتري' و شركة ADM (الطرف البائـع )'
على التالي :–

الطرف الاول (المشتري):وزارة التجارة/ الشركة العامة لتجارة
الحبوب

البريد الالكتروني :–

import1@iqgrainb.com
import2@iqgrainb.com
import3@iqgrainb.com
irac_grain@hotmail.com

الطرف الثاني (البائع)  :

ADM RICE , INC
660 WHITE PLAINS RD
NEW YORK, N.Y. 10591
TEL : 914-366-7125
FAX : 914-366-7137
EMAIL : < admrice@admwor

١– الكمية والمواصفات

ا–الكمية :– ١٢٠ الف طن ( مائة وعشرون الف طن) +– ٥ %

ب– المواصفات  :

رز ابيض حبة طويلة جرش جيد وبالمواصفات التالية :

١– صالح للاستهلاك البشري عند نقطة الوصول النهائية (ميناء
التفريغ) ويتم استهلاكه في بلد المنشأ .

٢– الرطوبة : كحد اعلى ١٤ %(مسموح لغاية
١٥% يخصم قدره ١:١على اساس سعر العقد)

</div>

3-Broken kernels – up to 5% maximum

4-Whiteness – no less than 40 degree minimum

5-Red kernels and other kinds – up to 1.5% maxim

6-Damaged kernels and breakage by heat up to 0.5 %

7-Chalky kernels – no more than 3% preferred, but up to 4% maximum allowed, with a 1:1

8-Paddy kernels        – up to 0.1% maximum

9-Yellow kernels – up to 0.5% maximum

10-Foreign matter        – up to 0.1% maximum

11-Pesticide residues to be within international limit

12-H.Heavy metals ( Mercury , Lead and Cadmium) according to the international limits.

13-Free of any abnormal odor that indicates any damage to the rice

14-not modified genetically (NON GMO)

15-Dioxin and radiation to be within international limits.

16- free of live insects and their larvae , if any live insects infection on the cargo found at discharge port to be fumigated process with no more than  five dead insects / 1 kg .

17-New crop(2010)

18-(Aflatoxin ) – should be less than  5 ppb maximum

19-Discharge inspection to be according to the concerned inspection authority.


2. ORIGIN OF GOODS:        USA


3. PRICE :
- 549.75 USD PER METRIC TON ( five hundred forty nine dollar and seventy five  cent only ) CIF liner out umm Qaser

---

٣- الكسرة : ٥% كحد اعلى

٤- البياض : ليس اقل من  ٤٠ درجة كحد حتى

٥- الحبوب الحمراء والانواع الاخرى:١,٥ % كحد اعلى

٦- الحبوب المتضررة والمتضررة بالحرارة : ٥,٠% كحد اعلى

٧- الحبوب الطباشيرية ٣ % حد اعلى ومسموح به لغاية ٤ %
بخصم ١ % لكل ١ % زيــــــــــادة

٨- الشلب: ٠,١ % كحد اعلى

٩- الحبوب الصفراء : ٥,٠ % كحد اعلى.

١٠- المواد الغريبة : ٠,١ % كحد اعلى

١١-يجب ان تكون نسبة بقايا المبيدات ضمن الحدود العالمية

١٢- يجب ان تكون نسبة المواد الثقيلة : مثل (الرصاص، الزئبق الكادميوم) وفقا للحدود العالمية.

١٣- يجب ان تكون خالية من أي روائح غريبة تشير ان تضرر الرز

١٤- يجب ان تكون خالية من التعديلات الوراثية

١٥- الثثات الاشعاعي والديوكسين ضمن الحدود المسموح بها دوليا

١٦ . الرز خالي من الاصابة الحشرية الحية ويرقاتها وفي حالة وجودها يتم بمعالجتها لغرض القضاء على الحشرات الحية قبل تفريغ حمولة الباخرة على ان لا تزيد نسبة الحشرات الميتة ٥ حشرة/١ كغم

١٧-ان يكون المحصول جديد (٢٠١٠)

١٨- ان تكون نسبة السموم الفطرية  ( الفلاتوكسين ) اقل من خمسة اجزاء بالبليون كحد اعلى

١٩-يكون الفحص في ميناء التفريغ وفقا لسلطة الفحص المعنية


٢ – منشأ البضاعة :-      امريكـــــــــي


٣ – السعر

٥٤٩,٧٥ دولار اطن  ( خمسة وتسعة واربعون دولارا وخمسة وسبعون سنتا  ; على اساس مقلوع النكلفة والتامين والشحن لغاية الوصول ألى ميناء التفريغ ام قصر CIF ) liner Out ت

. TOTAL VALUE : USD 65970000
( sixty five millions nine hundred seventy thousands
usd only )

٤٤-القيمة الإجمالية :- ...... ٦٥٩٧٠٠٠٠ دولار

( خمسة وستون مليونا وتسعمائة وسبعون الف دولار فقط )

5. DELIVERY PERIOD:

October – november / 2010

ه- فترة الوصول :-

تشرين الأول – تشرين الثاني ٢٠١٠

6. METHOD OF ANALYSIS :

Iso no. 7301 ( details obtainable from internet under
"international standards organization ) or a recognized
equivalent to the satisfaction of the grain board .
Analysis will be on aoce method.

٦ – طريقة التحليل :-

تكون الطريقة الاساسية للفحص على اساس طريقة ISO NO 7301

يمكن الحصول على التفاصيل على شبكة الانترنيت ) منظمة المعايير

العالمية ) أو أي طريقة مماثلة مقبولة لدى الشركة العامة لتجارة الحبوب.

7. INSPECTION :
the seller shall submit a certificate of inspection
from one of the following companies

1- Intertek Testing Services

2- Baltic control

3 - SGS

٧ –الفحص :-

يجب على البائع ان يقدم شهادة الفحص من احد الشركات التالية :

Intertek Testing Services  – ١

Baltic Control- ٢

SGS – ٣

The First Set Of Tests will be conducted by an
independent surveyor at the point of  origin and
loading of the commodity, against the specifications
listed in section
( 1-b) and test results will be sent to the buyer .

The Second Set Of Tests will be conducted by
Laboratories of Grain Board of Iraq in Baghdad ,.
Samples will be taken from each hold of the vessel ,
inspected separately , and considered a separate
consignment.

الجزء الاول من الفحص :- يقوم بفحص البضاعة شركة فاحصة

مستقلة عند بلد المنشأ وتحميل البضاعة طبقـــا للمواصفات المدرجة

في الفقرة (١-ب) وترسل نتائج الفحص ثل المشتري .

الجزء الثاني من الفحص : تقوم الشركة العامة لتجارة الحبوب باجراء

الفحص الثاني عندما تصل المؤونة الى منفذ الدخول في العراق . تؤخذ النماذج

من كل مخبار من مخابر الباخرة وتفحص كلا على حدا ، ويعتبر كل نموذج ارسالية

منفصلة

tests will be conducted by the buyer in its food
laboratory,in accordance with relevant international
standards,to confirm compliance with the quality
specifications indicated.
Grain Board testing will be completed not later than ten
(10) days after the arrival of  commodities at the point
of entry or any other arrangement .

تجري الشركة العامة لتجارة الحبوب الفحص في مختبرها طبقاً

للمعايير الدائسة لتأكيد مطابقة البضاعة  مع مواصفات النوعية المشار اليها.

يجب ان تكمل الشركة العامة لتجارة الحبوب عملية فحص البضاعة خلال

فترة اقصاها ١٠ ) ايام من وصول البضاعة عند منفذ الدخول او اي اتفاق

اخر .

Any deviations from the Iraqi standard specifications
must be approved by the buyer and with this  approval
It will be adopted as final otherwise the two contracted
parties have the rightto appoint third party inspector
either iraqi ( inside iraq ) or international company (
outside iraq ) to reanalyse the goods for the

اي اختلاف عن المواصفات القياسية العراقية يجب ان يكون مقبولاً من قبل

الشركة العامة لتجارة الحبوب، وبهذا القبول يعتبر نهائي و بخلافه يحق للطرفين

المتعاقدين تعيين شركة فاحصة لاثة ) عراقية او شركة عالمية) لاعادة فحص

specifications in dispute the seller to submit objection against the results of the buyer within 48 hours from date of advice.

If the results of third party inspection correspond to buyer's laboratory results . The seller will be Responsible For Any Costs , Fees , Charges And / Or Legal Consequences At Discharge Port .

If the results of third party inspection correspond to seller's laboratory results . The buyer will be responsible for any costs , fees , charges and / or legal consequences at discharge port .

The two parties are bound by third inspection results. If the commodity does not meet contracted specification, either in point of origin or at point of entry into Iraq , unless approved by the buyer ,the seller is liable and responsibleto re export the   commodity at no  expense to the buyer and  supplier has to choose eitherto ( re-export the rejected quantity after compensating buyer with same quantity that is           according to its specifications or to authorize buyer to take care of rejected  goods after the supplier settles the matter either by paying  buyer the equivalent amount or compensate buyer with same quantity .

## WEIGHT AND QUALITY:

Weight and quality are final at discharge port as :-
The buyer will weigh the quantity of the commodity when it is discharged at the point of entry into Iraq and compare this with bill of loading . Any incompliance of Iraqi   standard   specification   will   be   seller's responsibility and will be deducted  from the performance pond .
Any losses, shortages and damages of the commodity after it arrives at Umm Qaser port will be demanded the supplier to pay it or deducted from the performance pond .

## 8-PACKING AND MARKING :
### A- PACKING:

the rice must be packed in a new, strong, minimum weight of 130 grams, antislip  woven polypropylene bags, each containing 50 kilograms net weight of rice.all bags are to be clean, dry, undamaged, firmly sewn, and printed with the  required marking. Spare bags will be provided with the cargo , in the amount of 5000 empty

المصانعة  على  ان  يرد  طلب  البائع  خلال  ٤٨  ساعة  من  تبليغه  بالنتائج .

اذا  كانت  نتائج  الفحص  الثالث  مطابقة  لنتائج  فحص  مختبرات  المشتري عندها  سيكون  البائع  مسؤلا  عن  كافة  المصاريف  والاجور  و/ او التبعات  القانونية  في  ميناء  التفريغ .

اذا  كانت  نتائج  الفحص  الثالث  مطابقة  لنتائج  فحص  مختبرات  البائع عندها  سيكون  المشتري  مسؤل  عن  كافة  المصاريف  والاجور  و/ او التبعات  القانونية  في  ميناء  التفريغ

يجب  ان  يلتزم  الطرفان  بنتائج  الفحص  الثالث.في  حالة  عدم  مطابقة البضاعة  للمواصفات  التعاقدية  اما  عند  نقطة  المنشأ  او  عند  نقطة الدخول  الى  العراق  ،  ما  لم  يتم  قبولها  من  الشركة  العامة  لتجارة  الحبوب ،  سيكون  البائع  مسؤلا  عن  اعادة  تصدير  البضاعة  وبدون  تحمل المشتري  اي  نفقات  و  على  البائع  ان  يختار  بين  اعادة  تصدير  الكمية المرفوضة  بعد  تعويض  المشتري  بنفس  الكمية  وطبقا  للمواصفات المطلوبة  او  تخويل  المشتري  للاهتمام  بالكمية  المرفوضة  بعد  تسوية  البائع للموضوع  اما  بدفع  المبلغ  المعادل  للمشتري  او  تعويضه  بنفس  الكمية

الوزن  والنوعية :-

يكون  الوزن  والنوعية  نهائي  في  ميناء  التفريغ  حيث  يقوم  المشتري بوزن  الكمية  عند  تفريغها  في  نقطة  الدخول  في  العـراق  ومقارنة  تلك الكمية  مع  بوليصة  الشحـــن .  اي  مخالفة  في  المواصفات  القياسية العراقية  ستكون  من  مسؤولية  البائع  ويتم  استقطاع  قيمتها  من  مبلغ الكفالة .

اي  فقدان  ،  نقص  ،  ضرر  في  البضاعة  بعد  وصولها  الى  ميناء  ام  قصر سيتم  مطالبةالجهز  بتسديده  او  استقطاع  قيمته  من  مبلغ  كفالة  حسن التنفيذ

ا- ١ التعبئة  والتغليف  والعلامات :

أ- التعبئة :  يعبأ  الرز  في  اكياس  بولي  بروبلين  زنة  ١٣٠غم  نظيفة وبحالة  وغيرقابلة  للتمزق  ،  متماسكة  ونحبوكي      كمية  ٥٠  كلم  صافي من  مادة  الرز  واث  تكون  مطبوعة  بالعلامة  المطلوبة  من  قبل  الشركة العامة  لتجارة  الحبوب .

bags each of 130 gm weight free of charge to be shipped with each shipment bearing the same marking using for repacking of torn bags at port of discharge. In condition that 75% of these empty bags to be unmarked

**B- MARKING:**
bags to be marked as follows :-

Iraqi ministry of trade / grain board of iraq

Rice

Gross and net weight

Date of production

Country of origin

Code or full name of production enterprise

Contract number

Note :-
Marking Should Be In Both Languages , Arabic & English

## 9. PAYMENT :

The Iraqi Trade Bank will issue an irrevocable letter of credit in favor of the seller. Seller shall be paid 100% of the contract value against presentation of the following documents:

A. Commercial invoice referencing Letter of Credit number and date of issuance. and showing delivery information to include item description, quantity, unit, price per unit, total quantity, total price, country of origin, manufacturer/company, point of entry, and delivery terms, SWFT code (for both Iraqi and foreign bank), name of account holder, and account number for seller's foreign bank.

B. Full set of internationally recognized clean on board B/L.

C. the following certificates .
　　1. Certificate of origin confirmed by commercial attaché ( Iraqi embassy ) at the country of origin

كذا يجب شحن كمية ٥٠٠٠ كيس فارغ مجانا مع كل شحنة على ان تكون ٧٥% من تلك الكمية بدون علامات لغرض تعبئة الاكياس المزقة في ميناء التفريغ

ب-العلامات : يجب وضع علامة على الاكياس وكالتالي :

وزارة التجارة / الشركة العامة لتجارة الحبوب

الـــــرز

الوزن الصافي والقائم :

تاريخ الانتاج :

المنشأ :

اسم ورمز المؤسسة المنتجة ( المصدرة ) :

رقم العقد :

ملاحظة —
يجب ان تكون العلامات المذكورة اعلاه باللغتين العربية والانكليزية

٩— الدفع :
يصدر المصرف العراقي للتجارة كتاب اعتماد غير قابل للنقض لصالح البائع .

يتم الدفع للبائع بواقع ١٠٠% من قيمة العقد لقاء تقديم المستندات التالية:

أ) قائمة تجارية موقعة من البائع تشير الى رقم الاعتماد وتاريخ اصداره وتظهر معلومات التسليم وتتضمن الفقرات التالية :
وصف المادة / الكمية / الوحدة /السعر لكل وحدة / اجمالي الكمية / السعر الاجمالي/ بلد المنشأ /الشركة المصنعة / نقطة الدخول/ شروط التسليم / رمز تحويل الارصدة لي/ لكل من البنك العراقي والاجنبي /اسم صاحب الحساب ورقم حساب البائع .

ب) طقم كامل من بوليصة الشحن النظيف B/L ( على ظهر الباخرة ) على ان تكون تلك البوليصة معروفة دوليـا .

ج— الشهادات التالية :
١) شهادة المنشأ مصادقة من الملحقية التجارية/السفارة العراقية ) في بلد المنشأ .

2. Certificate By The Surveyor Accepted By The Grain Board Confirming Compliance Of The Goods To Contractual Specifications.

3. Certificate issued by a health or phytosanitary authority or the surveyor confirming that goods are fit for human consumption and are consumed in the country origin.

4. Certificate Issued By A Health Or Phytosanitary Authority Or The Surveyor Stating That Goods Are Free From Radiation And Dioxin / As Regards Heavy Metals And Pesticide Residues Within The International Limit As Stated In Para (1-B) Of Specification

5. certificate issued by The Surveyor Stating That The Imported Commodity And Its Raw Materials Have Not Been Genetically Modified

6. packing lists

7. bank charges within iraq will be deducted from the buyer account, while charges for banking transactions outside of iraq will be deducted form the seller's account.

In case of the acceptance of grain board for any extension to shipment validity or L/C validity is required by the supplier then all charges will be on his account and grain board of Iraq has the right of imposing the penalty clauses in Para ( 10).

the seller will be responsible for all banking charges incurred in the event the   seller fails to fulfill its obligations in supplying the commodity or in otherwise  complying with , or canceling the letter of credit. partial payment can be made corresponding to actual deliveries.

٢) شهادة عن شركة فاحصة مخولة لدى الشركة العامة لتجارة الحبوب تؤكد مطابقة البضاعة للمواصفات المتعاقد عليها عند نقطة الشحن .

٣) شهادة صادرة من سلطة صحية او الشركة الفاحصة  في بلد المنشأ تنص على ان البضاعة صالحة للاستهلاك البشري وتستهلك  في بلد المنشأ وان البضاعة خالية من الاشعاع ومادة الدايوكسين اما بالنسبة للمعادن الثقيلة ووجود المخلفات المبيدية فيجب ان تكون ضمن الحدود العالية وكما هو منصوص عليه في الفقرة (١-ب ) من المواصفات.

٤) شهادة صادرة من شركة فاحصة تؤكد ان البضاعة خالية من الاشعاع ومادة الدايوكسين اما بالنسبة للمعادن الثقيلة ووجود الحشرات  فتكون ضمن الحدود العالية وكما هو منصوص عليه في الفقرة (٦) من المواصفات

٥) شهادة صادرة من الشركة الفاحصة تنص على ان البضائع المفحوصة الخاص بوجود الرز غير المعدل وراثياً .

٦) قوائم التعبئة والتغليف

٧) تستقطع العمولات المصرفية داخل العراق من حساب الشركة العامة لتجارة الحبوب و العمولات المصرفية خارج العراق من حساب البائع .  يستقطع المصرف المراسل علد العمولات من المستفيد الاول لتاريخ وقت كتاب فتح الاعتماد .

في حالة موافقة تجارة الحبوب على تمديد نفاذ الشحن او نفاذ الاعتماد بناء على طلب المجهز فستكون جميع مصاريف التمديد على حسابه و لتجارة الحبوب الحق في فرض الغرامة الجزائية في الفقرة (١٠) .

ويكون البائع مسؤول عن كل العمولات المصرفية التي تحدث خلال فشل البائع في تلبية التزاماته بتجهيز البضاعة او مخالفتها او الغاء الاعتماد .  يسمح بالدفع الجزء وفقا للاستلام الفعلي .

D.  payment may be made by electronic fund transfer

## 10. PENALTY CLAUSE :-

In case supplier fail to ship according to the delivery period specified in the contract . The supplier shall pay at the rate of ( 92 ) cent per ton ( ninty two cent  per ton ) per day for the period of delay if total penalty to be paid amount to 10% pct of period of the contract the purchaser have the right to cancel the contract and claim the difference in prices from a replacement purchase plus the accumulated penalty plus any consequential damages resulting from the breach of contract (penalty per ton per day calculated:  the price per ton divided by contract period  multiplied 10 pct)} and the first party ( buyer ) has the  right of awarding the contract to another party and first seller have to pay the administration charges at rate of 20% from the contract value .

## 11. ARBITRATION:-

All attempts will be made to settle amicably any claim or dispute that arises as a result of this contract between the seller and the grain board . If the claim or dispute cannot be  settled within 60 days of one party receiving a request for arbitration from the other party. arbitration will be made in accordance with iraqi law no. 83 of 1969 and its amendments .

## 12. INSURANCE :

To Be Covered By Seller  for all risks (Umm Qaser)

## 13. PERFORMANCE BOND:

The seller should submit a performance bond at 10% (ten percent) of the contract value within 10 days from the date of awarding quantity by grain board from any Iraqi Bank depended by central bank Of Iraq /Baghdad (only) in case of non-submitting the performance bond within the said period, the grain

7

---

د – يتم تحويل المبلغ بأي لصالح البائع .

## ١٠ – الغرامة الجزائية :–

في حالة اخفاق البائع في الشحن وبما يتلائم مع فترة الوصول المحددة في العقد سيقوم البائع بدفع غرامة تأخيرية للمشتري قدرها(٩٢) سنت/ طن  ( اثنين وتسعون سنتا لكل طن ) عن كل يوم تأخير في فترة التأخير .وفي حالة تجاوز المبلغ الكلي للغرامة ٠ ١% من مدة العقد يحق للطرف الأول الغاء العقد وتحميل الطرف الثاني كلفة فرق استراد البضاعة البديلة والغرامة المحتسبة وأية خسائر أخرى الأضرار الناتجة عن خرق تنفيذ العقد ويحتسب مبلغ الغرامة للبود الواحد على أساس(السعر لكل طن ÷ فترة العقد × ٠ ١%) يحق للطرف الاول ( المشتري ) بسحب العمل في حالة اخلال البائع واحالة الى طرف اخر مع تحميل البائع الاول تحميلات ادارية عن ٢٠% من الكلفة الفعلية للعقد

## ١١– التحكيم :–

تجري كل المحاولات لتسوية الودية في حالة حدوث اي مطالبة أو نزاع ناشئ عن هذه الشافصة أو العقد المتفق بين البائع والمشتري  فاذا لم يتم تسوية هذه الدعوى أو النـزاع خلال ٦٠ يوم من تاريخ استلام أحد الاطراف طلب للتحكيم من الطرف الثاني عندها سيكون التحكيم وفقا لقانون العراقي  وحسب القانون المدني رقم ٨٣ لسنة ١٩٦٩ وتعديلاته

## ١٢– التأمين :

يكون البائع مسؤولا على تأمين البضاعة لغاية وصولها الى ميناء التفريغ (ام قصر) .

## ١٣–كفالة حسن التنفيذ –

يترجب على البائع تقديم كفالة حسن التنفيذ والبالغة ٠ ١% من قيمة العقد خلال( ٠ ١أيام ) عن تاريخ احالة الكمية من قبل تجارة الحبوب ومن خلال أي مصرف عراقي معتمد من قبل البنك المركزي العراقي – بغداد (حصرا) وفي حالة عدم تقديمها في الفترة المحددة يكون الحق لتجارة الحبوب

ﻝﻚ

board has the right to forfeited the bid bond.

The performance bond must be according to the terms of central bank Of Iraq or other depended banks made payable to grain board. The performance bond will be valid for the duration of the contract and for sixty days beyond the expiry date of the contract. If the supplier fail to fulfill his contractual obligation in full or in part, grain board of Iraq will confiscate the bank guarantee and the seller will be black listed the performance bond will be returned to the supplier on full and satisfactory completion of the contract. However, the supplier will be required to submit a formal request for the release of the performance bond.

## 14 . FORCE MAJEURE :

Either party shall not be liable for default and / or liquidated damages, if and to the extentthat its failure to perform its obligations under the contract is the result of force majeure . Force majeure shall mean acts of god in laws or regulation, acts of war, civil disturbances, explosions, natural disasters.within 24 hours of the occurrence of the force majeure. the relevant party shall give written notice and full particulars of the force majeure to the other party . Provided always that such party shall do his best and reasonable effort to obviate or to minimize such failure . However and in all cases force majeure as aforesaid shallnot be construed to include any act or circumstance which has been due or in any way attributed to the party claiming force majeure or his fault or negligence .

In case of delays in the fulfillment of obligations caused by force majeure the relevant party shall be entitled to claim an extension of time and the other party shall determine the extension of time , if any , which shall be reasonable and proper.

15.If any live insects infection on the cargo found at discharge port , the seller to pay  (1.5) one and half USD / per MT as charges for fumigation process .

بمصـــادرة كفـالة المشـاركة يلتفتـصـة (BID BOND).

تكزن الكفـالة وفقـا لشروط  البنك المركزي العراقي او المصـارف المعتمدة الأخرى ومستحقة الدفع الى تجارة الحبوب . تكون الكفالة فعلة خلال فترة التعاقد وبعد ٦٠يوم من نفاذ العقد . في حالة اخفق المجيز في تنفيذ جميع التزاماته التعاقدية أو جزء منها فتلشركة العامة لتجارة الحبوب الحق بمصـادرة كامل مبلغ الكفالة ويوضع البائع في القائمة السوداء وتعاد قيمة الكفالة الى المجيز عند الإنجاز المرضى للعقد وعند تقديم المجيز طلبا رسميا لأطلاق مبلغ كفالة حسن التنفيذ .

١٤- الظروف القاهرة :ـ

لايكون اي من الفرقين مسؤولاً عن الاخفاق أو الضرر في حالسة ان يعزى الاخفاق في تنفيذ  التزامانه الى المظروف  القاهرة التي تعنــي : حوادث القدر ، القوانين والانظمة ـ الحروب ، الفوضـــى المدنيــة ، الانفجارت ، الكوارث  الطبيعية عليه يقوم الطرف المعني(البائع) خلال ٢٤ ساعة من ظهـور الظروف القاهرة بتقديم اشعار يتضمن كافـة تفاصيل تظرف القاهر الذي يواجهه ويعمل ما يوسعه لتلافي الاضرار الناتجة عن ذلك الظرف القاهسـر . وفي كل الاحوال لا يمكن اعتبــار .ـ أي عمل او ظرف يعزى الى اعمال او تصير عليتع كتظرف قاهر . وإن حالة تأخر البائع في تنفيذ التزاماته بسبب احد الظروف القاهرة اعلاه يحق له المطالبة بتمديد فترة الشحن  والاعتماد على ان تكـون هــذه الفترة معقولة ومناسبة.

١٥- في حالة وجود اي اصابة حشرية  حية في الحمولة في ميناء التفريغ ،  يقوم البائع بدفع مبلغ ١.٥ دولار/ طن  (دولار واحد ونصف لكل طـن متري ) عن اجور عملية التبخير .



16. All written and oral communications prior to the signing of this contract are null and void .

١٦ – تعتبر جميع المراسلات الخطية والشفوية قبل توقيع العقد ملغيــــه وغير نافذة.

17. the contract or any interest their in, shall not be assigned by either party. voluntarily or compulsory . without prior written consent of the other party .

١٧ – لا يحق لأحد الطرفين تظهير العقد أو اي منفعة فيه طوعــا أو إجبارا دون موافقة خطية من الطرف الآخر .

18- the supplier paid usd (      )        dollar )

١٨ – تم تسديد رسم الطابع البــالغ        (        ) دولار ) as stamp tax         من قبل المجهز .

# ADM RICE, INC.

**AUTHORIZED SIGNATURE**

**FOR SECOND PARTY**
**( SELLER)**
**ADM RICE , INC**

*Muthanna*

**FOR FIRST PARTY**
**(BUYER )**
**Ministry of Trade**
**Grain Board of Iraq**

5 - 9 - 2010

F - 2010  contract-r-37

# EXHIBIT G

**From:** Nail, Shannon <Shannon.Nail@adm.com>
**To:** Bonnesen, Christian <Christian.Bonnesen@adm.com>; Rodriguez, Jorge <Jorge.Rodriguez@adm.com>
**Cc:** Kim, Danny HT
**Sent:** Fri Feb 11 13:14:03 2011
**Subject:** FW: TFTS-868801 (Archer Daniels Midland Co.)

Danny – Please advise how long we have to pay and if it would be OK to ask if they would send a fax copy of the drawing?

**From:** Kharga, Satya [mailto:Satya.Kharga@jpmchase.com]
**Sent:** Friday, February 11, 2011 12:05 PM
**To:** Nail, Shannon
**Cc:** Kosik, Andrew J; Saba, Farideh; Alonzo, James
**Subject:** FW: TFTS-868801 (Archer Daniels Midland Co.)
**Importance:** High

Hi Shannon,

As per our conversation, please see details below regarding drawing, please note, this is a straight drawing (not an extend or pay), please let us know when to expect payment.

Regards,

**Satya Kharga - JPMorgan Chase Bank , 1 Chase Plaza, 3rd Floor,  New York, NY 10005 -NY1-A087, Tel: 212-552-2006, Fax: 212-552-7819, email: satya.kharga@jpmchase.com**

**From:** Kosik, Andrew J
**Sent:** Friday, February 11, 2011 11:11 AM
**To:** LC Coll Group; Kharga, Satya; Saba, Farideh
**Cc:** Alonzo, James
**Subject:** TFTS-868801 (Archer Daniels Midland Co.)
**Importance:** High

We received an in compliance drawing under SBLC No. TFTS-868801

for USD6,926,850.00

Obligor: Archer Daniels Midland Co. (CIF 9102747079)

Presenter: Trade Bank of Iraq

Beneficiary: Trade Bank of Iraq

AMOUNT

PRINCIPAL                     USD          6,926,850.00

PAYMENT COMMISSION       USD                6,926.85

                    TOTAL USD    6,933,776.85


Please arrange to wire immediately available funds in the amount of USD6,933,776.85

To:

JPMORGAN CHASE BANK N.A.

ABA NUMBER: 021000021

ACCOUNT NUMBER: 324-331754

REFERENCE LC NO. TFTS-868801

Attn: SBLC Dept.

Thank you.

Regards,

Andrew J Kosik, CDCS
Standby Letter of Credit
PH: 813 432-5578
FAX: 813 432-5161


For general Letter of Credit inquiries regarding previously issued Letters of Credit, please contact our Client Service mailbox at GTS.Client.Services@JPMChase.com or by phone at 1-800-634-1969.

Billing related inquiries should be directed to our Billing Team at mailbox GTS-Trade Billing.


This communication is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of

any transaction. All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice. Any comments or statements made herein do not necessarily reflect those of JPMorgan Chase & Co., its subsidiaries and affiliates. This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you. Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to European legal entities.

CONFIDENTIALITY NOTICE:
This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by email reply.

# EXHIBIT H



**ADM Rice, Inc.**
660 White Plains Road, Suite 605
Tarrytown, NY 10591
United States of America
T 914.366.7100  F 914.366.7137

February 11, 2011

JP Morgan Chase Bank
Global Trade Services
1 Chase Manhattan Plaza 3rd Floor
New York, NY 10005
Attn. Mr. Danny Kim, Vice President
Cc: Farideh Saba

Dear Sirs:

Standby Letter of Credit No. TFTS-868801 in the amount of $6,926,850
Our Contract Ref.: MOT/GB/R5/4/2010

We refer to your advice that the Ministry of Trade/Grain Board of Iraq have threatened to make a demand for payment under the Performance Bond issued in their favor by the Trade Bank of Iraq. We believe that such a demand is wrongful and not in compliance with the terms of the Performance Bond. This is because only the first shipment has been delivered, and because, contrary to the explicit requirements of the Performance Bond, there cannot be "an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications".

With respect to your related obligations under the Standby Letter of Credit in favor of the Development Fund for Iraq, we seek assurances that you will insist upon proper documentation relating to any "such demand" so that you will be able to satisfy yourselves that the demand does or does not comply with the terms of the Performance Bond (including its requirement for a SGS laboratory report). As you will see from the terms of your Standby Letter of Credit, this documentary review is required because your undertaking to pay is only triggered "provided that such demand is in accordance with the Performance Bond."

We further place you on notice that, in the present circumstances, any statement that you may receive purporting to confirm that a demand has been presented, and that it is in accordance with the Performance Bond, cannot be correct, or truthful, and cannot be relied upon to satisfy the requirements for your obligations to pay under the Standby Letter of Credit.

Best Regards,

**ADM Rice Inc.**

Christian Bonnesen,
President

Cc:   Tampa Operation
Fax:  813-432-5161

# EXHIBIT I

**From**: Majdoubeh, Amjad (Baghdad) [mailto:Amjad.Majdoubeh@sgs.com]
**Sent**: Saturday, February 12, 2011 02:14 AM
**To**: Mathur, Ashish
**Subject**: Re: MV Captain Harry currently discharging at Um Qasr

Dear Ashish

We never issued such report
Best regards

Amjad Majdoubeh
SGS Gulf Iraqi Branch
Branch Manager
Mob:+962776710203

On Feb 12, 2011, at 5:27 AM, "Mathur, Ashish" <Ashish.Mathur@adm.com> wrote:

Amjad

Urgent attention

**MV Captain Harry currently discharging at Um Qasr**

As  understand it discharge is proceeding normally and the cargo is on specification.

Can you please advise urgently whether or not SGS have issued a laboratory report in relation to this cargo  certifying that the quality of the purchased rice does not meet the contractual specifications

Best, Ashish


Sent from my iPad

CONFIDENTIALITY NOTICE:
This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by email reply.


Information in this email and any attachments is confidential and intended solely for the use of the individual(s) to whom it is addressed or otherwise directed. Please note that any views or

opinions presented in this email are solely those of the author and do not necessarily represent those of the Company. Finally, the recipient should check this email and any attachments for the presence of viruses. The Company accepts no liability for any damage caused by any virus transmitted by this email. All SGS services are rendered in accordance with the applicable SGS conditions of service available on request and accessible at http://www.sgs.com/terms_and_conditions.htm

# EXHIBIT J

## BURKE & PARSONS

COUNSELORS AT LAW
100 PARK AVENUE
NEW YORK NY 10017-5533

TELEPHONE + 1 212 354 3800
www.burkeparsons.com

February 12, 2011

**VIA FEDEX**

JPMorgan Chase Bank, N.A.
Global Trade Services
300 South Riverside Plaza
Mail Code IL1-0236
Chicago, IL 60606-0236

**Standby Letter of Credit No. TFTS-868801
in the amount of $6,926,850 -
ADM Rice, Inc. contract MOT/GBIR5/4/2010
Our Ref: 9240**

Dear Sirs:

Please take notice of the enclosed letter from our client ADM Rice, Inc. to
JPMorgan Chase Bank, Global Trade Services dated February 11, 2011, regarding an
attempted wrongful demand for a drawing under your letter of credit no. TFTS-
868801. Since the enclosed letter was written, ADM Rice has confirmed that, as
expected, SGS has NOT issued a "laboratory report certifying that the quality of the
purchased commodity does not meet the contractual specifications." In this regard, we
enclose an email from Ashish Mathur of ADM Rice to the branch manager of the Iraqi
Branch of SGS Gulf, and the branch manager's reply of February 12, 2011 in which he
advises that SGS "never issued such report."

Based upon the foregoing, it is now clear that you have now been notified of facts
that confirm there cannot have been any purported drawing under the Performance
Bond that would also be "in accordance with the Performance Bond," as explicitly
required by the terms of your standby letter of credit. Rather, any such demand must
be false. Thus, the attempted drawing under the above-mentioned standby letter of

JPMorgan Chase Bank, N.A.      Page 2 of 2      February 12, 2011
Global Trade Services

credit is based upon false premises and representations. Accordingly, it must be rejected by you.

<div style="text-align:right">

Very truly yours

BURKE & PARSONS

Keith W. Heard
heard@burkeparsons.com

</div>

Enclosures (2)

cc:    JPMorgan Chase Bank, N.A.
        Attn: Mr. Danny Kim
            (New York)

        ADM Rice, Inc.
        Attn: Mr. Christian Bonnesen

O:\CM\9240_ADM\BP_COR\9240_0002.DOCX



**ADM Rice, Inc.**
660 White Plains Road, Suite 605
Tarrytown, NY 10591
United States of America
T 914.366.7100  F 914.366.7137

February 11, 2011

JP Morgan Chase Bank
Global Trade Services
1 Chase Manhattan Plaza 3rd Floor
New York, NY 10005
Attn. Mr. Danny Kim, Vice President
Cc: Farideh Saba

Dear Sirs:

Standby Letter of Credit No. TFTS-868801 in the amount of $6,926,850
Our Contract Ref.: MOT/GB/R5/4/2010

We refer to your advice that the Ministry of Trade/Grain Board of Iraq have threatened to make a demand for payment under the Performance Bond issued in their favor by the Trade Bank of Iraq. We believe that such a demand is wrongful and not in compliance with the terms of the Performance Bond. This is because only the first shipment has been delivered, and because, contrary to the explicit requirements of the Performance Bond, there cannot be "an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications".

With respect to your related obligations under the Standby Letter of Credit in favor of the Development Fund for Iraq, we seek assurances that you will insist upon proper documentation relating to any "such demand" so that you will be able to satisfy yourselves that the demand does or does not comply with the terms of the Performance Bond (including its requirement for a SGS laboratory report). As you will see from the terms of your Standby Letter of Credit, this documentary review is required because your undertaking to pay is only triggered "provided that such demand is in accordance with the Performance Bond."

We further place you on notice that, in the present circumstances, any statement that you may receive purporting to confirm that a demand has been presented, and that it is in accordance with the Performance Bond, cannot be correct, or truthful, and cannot be relied upon to satisfy the requirements for your obligations to pay under the Standby Letter of Credit.

Best Regards,

**ADM Rice Inc.**

Christian Bonnesen,
President

Cc:   Tampa Operation
Fax:  813-432-5161

**A Subsidiary of Archer Daniels Midland Company**

**From**: Majdoubeh, Amjad (Baghdad) [mailto:Amjad.Majdoubeh@sgs.com]
**Sent**: Saturday, February 12, 2011 02:14 AM
**To**: Mathur, Ashish
**Subject**: Re: MV Captain Harry currently discharging at Um Qasr

Dear Ashish

We never issued such report
Best regards

Amjad Majdoubeh
SGS Gulf Iraqi Branch
Branch Manager
Mob:+962776710203

On Feb 12, 2011, at 5:27 AM, "Mathur, Ashish" <Ashish.Mathur@adm.com> wrote:

Amjad

Urgent attention

**MV Captain Harry currently discharging at Um Qasr**

As  understand it discharge is proceeding normally and the cargo is on specification.

Can you please advise urgently whether or not SGS have issued a laboratory report in relation to
this cargo  certifying that the quality of the purchased rice does not meet the contractual
specifications

Best, Ashish

Sent from my iPad

CONFIDENTIALITY NOTICE:
This message is intended for the use of the individual or entity to which it is addressed
and may contain information that is privileged, confidential and exempt from disclosure
under applicable law. If the reader of this message is not the intended recipient or the
employee or agent responsible for delivering this message to the intended recipient, you
are hereby notified that any dissemination, distribution or copying of this communication
is strictly prohibited. If you have received this communication in error, please notify us
immediately by email reply.

Information in this email and any attachments is confidential and intended solely for the use of
the individual(s) to whom it is addressed or otherwise directed. Please note that any views or

opinions presented in this email are solely those of the author and do not necessarily represent those of the Company. Finally, the recipient should check this email and any attachments for the presence of viruses. The Company accepts no liability for any damage caused by any virus transmitted by this email. All SGS services are rendered in accordance with the applicable SGS conditions of service available on request and accessible at http://www.sgs.com/terms_and_conditions.htm