UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
ARCHER DANIELS MIDLAND CO. and ADM  :
RICE, INC.,                         :
                                    :
            Plaintiffs,             :     11 Civ. 0988 (JSR)
                                    :
      -v-                           :     MEMORANDUM ORDER AND
                                    :     PRELIMINARY INJUNCTION
JP MORGAN CHASE BANK, N.A.,         :
                                    :
            Defendant.              :
------------------------------------- x
JED S. RAKOFF, U.S.D.J.

     On February 14, 2011, the Court granted the request of plaintiffs, Archer Daniels Midland Co. and ADM Rice, Inc. (collectively "ADM"), for an order temporarily restraining defendant JP Morgan Chase Bank, N.A. ("Chase") from honoring a payment request by the Trade Bank of Iraq ("TBI") under a standby letter of credit ("the Letter of Credit") in the amount of $6,926,850. The Court received full briefing on ADM's accompanying motion for a preliminary injunction seeking the same relief, and, following an evidentiary hearing held on February 18, 2011, granted leave for both parties to submit additional briefing in support of their respective positions. By Order dated February 28, 2011, the Court directed that the temporary restraining order remain in effect until today, March 7, 2011, pending the Court's ruling on ADM's motion for a preliminary injunction. Having carefully considered the parties' submissions, the Court, for the reasons specified below, hereby grants the motion

and preliminary enjoins Chase from honoring TBI's request for payment under the Letter of Credit.

Based on the record presently before the Court, the pertinent facts are as follows.[1] ADM Rice, a wholly-owned subsidiary of Archer Daniels Midland Co., purchases rice and wheat, and exports these commodities to various countries around the world, including Iraq. Declaration of Christian Bonnesen, dated February 13, 2011 ("Bonnesen Decl.") at ¶ 3. Since 2005, ADM Rice has sold extensive amounts of rice and wheat to Iraq -- in shipments totaling approximately 4.4 millions tons -- through the Grain Board of Iraq ("GBI"), an entity under the supervision of the Iraqi Government's Ministry of Trade. Id. As a condition of its transactions with GBI, ADM Rice agrees to post a performance bond which guarantees the quality of the rice or wheat. See transcript, 2/18/2011 ("Tr.") at 14:16-15:14. Until the events that precipitated the instant motion, however, GBI had never demanded payment under any of these performance bonds. Id. Instead, GBI's occasional issues regarding the quality of ADM Rice's products were handled on an informal, commercial basis between the parties, with ADM agreeing to satisfy "every claim that [GBI] has made against ADM ... in full," and GBI thereby not having to resort to invocation of its rights under the performance bonds. Id. at 15:12-14.

---

[1] The findings of fact set forth below are made only for the purpose of this preliminary injunction and are subject to revision after further proceedings.

On August 25, 2010, GBI accepted ADM Rice's offer to sell it 120,000 metric tons of rice at a rate of $549.75 per metric ton, for a contract price of roughly $69 million. Bonnesen Decl. at ¶ 4. In typical fashion, the contract required ADM Rice to arrange for a performance bond through an Iraqi bank equivalent to 10% of the contract price. Id. at Ex. A. The next day, on August 26, 2010, ADM applied for a letter of credit in the sum of $6,926,850 with defendant Chase. Id. at Ex. B. Issuance of the Letter of Credit was contingent on the issuance by TBI -- which, like GBI, is an Iraqi governmental entity -- of a performance bond to GBI guaranteeing ADM's performance of the contract (the "Performance Bond"). Affidavit of James E. Alonzo, dated February 17, 2011 ("Alonzo Aff.") at ¶ 3.

On August 27, 2010, Chase issued the Letter of Credit, with ADM Rice as the account holder and TBI as the beneficiary. The Letter of Credit further states that TBI may draw funds as follows:

> [Funds are] . . . available against your authenticated Swift/Tested Telex that you have duly issued your Performance Bond as requested by ourselves and that you have received a claim in accordance with the terms of the performance bond.

Bonnesen Decl. Ex. 2 at 16. The Letter of Credit also expressly incorporates the terms of the Performance Bond itself, which was issued by TBI on or about September 2, 2010. See Letter of Credit at 14. The Performance Bond states, in relevant part, that:

3

> All claims made under this performance bond must be accompanied by an SGS original laboratory report specifically certifying that the quality of the purchased commodity does not meet the contractual specifications.

Id. SGS, formerly Société Générale de Surveillance, is an international quality inspection company. However, the Letter of Credit does not require that TBI submit a copy of the SGS report for Chase's review in order to request payment under its terms, but merely that GBI provide TBI with that report. See id.

On September 6, 2010, the sales transaction between GBI and ADM Rice was memorialized in a written contract (the "Contract"). Bonnesen Decl. at Ex. F. As directed in that contract, ADM Rice shipped 120,000 tons of rice (the "Cargo") from the United States to Iraq on three vessels. Id. at ¶ 14. The first vessel, the CAPTAIN HARRY, loaded its cargo of 40,000 tons of rice in Darrow, Louisiana between November 19 and November 23, 2010. See Hr'g Ex. 1 ("SGS Inspection Certificate No. 10112404AD"). After a nearly three month, transoceanic voyage, the CAPTAIN HARRY completed unloading at Umm Qasr, Iraq, on February 14, 2011. Bonnesen Decl. at ¶ 15. As of February 18, 2011, the remaining two vessels were still en route to Iraq. See Tr. at 25:14-15.

Before the Cargo left the United States, the quality of the rice was certified by both SGS and the U.S. Department of Agriculture. Bonnesen Decl. at ¶ 14. With regard to the rice shipped on the CAPTAIN HARRY, Peter Legemaate, Business Manager for

4

SGS's U.S. Agricultural Trade Services division, testified that SGS employees were in "complete supervision" during the loading of the rice. Tr. at 44:11-23. After its loadport inspection, which included laboratory analysis of rice samples taken from the cargo, SGS issued a Certificate specifically certifying that the the rice was in accordance with contractual specifications regarding its quality. See Hr'g Ex. 1. Further, on January 5-6, 2011, in accord with standard procedure for ADM Rice's shipments to Iraq, the CAPTAIN HARRY stopped in Fujairah, U.A.E., prior to its discharge in Iraq, for additional inspection and sampling of its rice cargo. Tr. at 18:6-12, 48:2-17. During its stop in the U.A.E., "[s]ampling and sample preparation was [sic] performed" on the cargo "in presence of Ms. Iraqi Grain Board, jointly with Ms. Survey & Inspection Services (SIS), vessels chief officer and SGS surveyors." Hr'g Ex. 2 ("SGS Inspection Report from Fujairah, No. J0229A-DB10"). After an analysis of the sampled cargo, as well as a visual inspection, the SGS inspectors concluded that the "[c]argo [on the CAPTAIN HARRY] was . . . in good condition." Id. at 3.

The CAPTAIN HARRY then proceeded to Umm Qasr, Iraq, where it arrived on January 8, 2011. See Hr'g Ex. 3 ("SGS Inspection Report from Umm Qasr, No. 02AGRI/IRAQ/2011"). Upon arrival, "[r]esampling [of the cargo] was performed at anchorage at Umm-Qasr pilot station area on 18/1/2011 at 1630 hrs." After the inspection was complete,

under the supervision of SGS inspectors, the rice was discharged over a period of eleven days, ending on February 14, 2011. Id. The SGS inspection report issued the following day, February 15, 2011, contains no indication that the condition of the rice cargo on the CAPTAIN HARRY was any different at Umm Qasr than it had been upon loading in Louisiana or upon inspection and sampling in Fujairah. See id.

Nonetheless, on February 10, 2011, Chase received an authenticated Swift notice from TBI stating that it had received a claim from GBI in accordance with the terms of the Performance Bond and seeking to draw down the entire amount of the Letter of Credit. See Alonzo Aff. Ex. C. On Friday, February 11, 2011, Chase notified ADM that it had received what was, in Chase's view, "an in compliance drawing" under the Letter of Credit, and, accordingly, that Chase intended to honor the request. See Bonnesen Decl. at Ex. G. Because ADM was not aware of any issues regarding the quality of the Cargo, Christian Bonnesen, President of ADM Rice, immediately contacted Danny Kim, a Vice-President of Chase's Global Trade Division, and communicated ADM Rice's position that the demand was "wrongful and not in compliance with the terms of the Performance Bond." Id. at Ex. H. The next day, on February 12, 2011, ADM Rice, through its employee Ashish Mathur, contacted the Iraqi Branch of SGS by e-mail and asked:

6

>Can you please advise me urgently whether or not SGS have issued a laboratory report in relation to [the] cargo certifying that the quality of the purchased rice does not meet the contractual specifications.

Id. at Ex. I. In an e-mail response that same day, Amjad Majdoubeh, the Branch Manager of SGS in Iraq, simply stated "We never issued such report." Id. Mr. Legemaate also made several inquiries within SGS to determine if the company had issued a laboratory report with respect to the Cargo. Tr. at 53:8-54:18. First, he checked SGS's worldwide electronic system for any such report, either existing or forthcoming. Id. at 53:17-21, 54:3-18. Finding none, he then contacted SGS's technical governance office in Geneva, Switzerland, which confirmed that SGS had not issued any adverse quality reports in connection with the Cargo. Id. at 53:12-14, 56:5-21. Finally, he spoke with Majdoubeh, whose approval is required for any quality certificate to be issued by SGS personnel in Iraq. Id. at 54:13-22. Majdoubeh confirmed that no adverse quality reports had been issued with respect to the Cargo, nor were any forthcoming. Id. at 57:7-14.

On February 14, 2011, James Alonzo, an Assistant Vice President at Chase, reiterated Chase's position to ADM that -- despite the foregoing -- because TBI's request for payment facially complied with the terms of the Letter of Credit, Chase felt obliged to honor the request. See Alonzo Aff. at Ex. E. That same day, ADM filed the instant action seeking to preliminary enjoin Chase from so doing.

7

To obtain a preliminary injunction in the Second Circuit, the movant must show (1) that it will suffer irreparable harm absent the injunction and (2) either (a) that it is likely to succeed on the merits or (b) that the motion presents sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. Citigroup Global Markets, Inc. v. VCG Special Opportunities, 598 F.3d 30, 35 (2d Cir. 2010). Accordingly, the Court first turns to whether ADM would suffer irreparable harm absent an injunction. In the instant circumstances, because neither TBI nor GBI have any known presence in the United States, this inquiry requires the Court to ascertain the relative prospects of ADM fairly litigating its claims against TBI and GBI in an Iraqi Court. See Rockwell Int'l Systems, Inc. v. Citibank, N.A., 719 F.2d 583, 586 (2d Cir. 1983) (holding that irreparable injury hinges on whether an account holder has an adequate alternate forum to protect its rights under a letter of credit). ADM contends that, as an American company, it stands little chance of receiving a fair adjudication of its claims against TBI and GBI, which are both Iraqi governmental entities, in Iraq. See Tr. 29: 8-11. In support, ADM submits a declaration from Sabah Al-Mukhtar, an Iraqi lawyer who states that he is familiar with conditions in the country's judicial system. See Declaration of Sabah Al-Mukhtar, dated February 18, 2011 ("Al-Mukhtar

Decl.") at ¶¶ 1-4. In his declaration, Al-Mukhtar describes the "almost total collapse of the judicial system" in Iraq because of the lack of sufficiently trained judges, overwhelming caseloads, and "unprecedented corruption." Id. at ¶¶ 7-8, 10. Further, noting the "[l]ack of independence" in the Iraqi judiciary, id. at ¶ 9, Al-Mukhtar concludes that "it is my considered opinion that ADM Rice Inc. will not be able to get a fair hearing in an Iraqi court because ... it is fighting the TBI and/or GBI and [because] it is 'foreign.'" Id. at ¶ 13.

On the basis of the unrebutted assertions made in the Al-Mukhtar declaration,[2] the Court concludes that ADM has no adequate alternative forum in which it could reasonably pursue its claims against TBI and GBI. Moreover, given the legal hurdles (discussed infra) that ADM would confront in pursuing post-payment remedies against Chase, the issuer of the Letter of Credit, which in these circumstances is effectively just a stakeholder, it seems almost certain that, absent an injunction, ADM would be left with no legal recourse whatsoever. See Brenntag Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245 (2d Cir. 1999). Accordingly, the Court concludes

---

[2] The Court, via contacts with TBI and GBI available to the parties here, conveyed through the parties' counsel its willingness to receive input from these entities or from the Iraqi government, but no response was received. See Tr. at 2:14-4:3.

that ADM would suffer irreparable harm in the absence of its requested injunction.

As to ADM's likelihood of success on the merits, it is true that New York law (which here governs) requires strict compliance with facially valid requests for payment under a letter of credit. See, e.g., Fluor Daniel Argentina, Inc. v. ANZ Bank, 13 F.Supp.2d 562 (S.D.N.Y. 1998). This is because New York courts follow the "independence principle," pursuant to which an issuing bank's obligations under a letter of credit are separate from, and independent of, the rights and obligations of the parties to the underlying commercial transaction. See Continental Grain Company v. Meridien International Bank Limited, 894 F. Supp. 654 (S.D.N.Y. 1995); 410 Sixth Ave. Foods, Inc. v. 410 Sixth Ave., Inc., 197 A.D.2d 435, 436 (1st Dept. 1993). Therefore, under New York law, a bank that issues a letter of credit is not required to look beyond the payment documents presented by the beneficiary in order to ascertain whether the parties to the underlying transaction have complied with their respective duties and obligations. See First Commercial Bank v. Gotham Originals, Inc., 64 N.Y. 287, 294 (1985).

Here, TBI complied with the express terms under which payment is available under the Letter of Credit by sending Chase an authenticated, facially valid Swift Notice stating that it had received a claim in accordance with the terms of the performance

bond. See Alonzo Aff. Ex. C. Accordingly, Chase was under no obligation to independently verify that the conditions in the Performance Bond had been met before rendering payment to TBI under the Letter of Credit.

Notwithstanding the above, "fraud in the transaction" constitutes a "well established exception to the rule that banks must pay a beneficiary under a letter of credit when documents conforming on their face to the terms of the letter of credit are presented." Semetex Corp. v. UBAF Arab American Bank, 853 F.Supp. 759 (S.D.N.Y. 1994); see also Rockwell. v. Citibank, 719 F.2d at 588-89 (a bank's obligation under a letter of credit does not extend to protect a party that seeks to "runs off with [the] plaintiff's money on a pro forma declaration which has absolutely no basis in fact"); United Bank Ltd. v. Cambridge Sporting Goods Corp., 41 N.Y.2d 254, 259 (1976) (same). This exception has been codified in the New York Uniform Commercial Code, which provides that an issuing bank may refuse to honor documents which "appear on [their] face strictly to comply with the terms and conditions of the letter of credit" but which are "forged or materially fraudulent," or if "honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant." N.Y. U.C.C. § 5-109(a) (McKinney 2000).

However, because the smooth operation of international commerce requires that requests for payment under letters of credit

11

not be routinely obstructed by pre-payment litigation, the fraud exception to the independence principle "is a narrow one" that is only available on a showing of "outright" and "intentional fraud." See All Service Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus do Brazil, S.A., 921 F.2d 32, 35 (2d Cir. 1990); see also Banque Worms, New York Branch v. Banque Commerciale Privee, 679 F.Supp. 1173 (S.D.N.Y. 1988) (the fraud exception "is limited to situations in which the wrongdoing of the beneficiary has permeated the entire transaction."). As a consequence, Courts in this Circuit enjoin payment under letters of credit "only rarely" and only upon a strong showing that the request for payment was fraudulently made. See Semetex, 853 F. Supp. at 774 (citing cases).

Here, however, just such a strong showing has been made. Indeed, ADM has adduced an array of unrebutted evidence that, taken collectively, strongly supports an inference that the rice aboard the CAPTAIN HARRY was in full compliance with the Contract's quality specifications. As this evidence (detailed above) demonstrates, TBI's representation to Chase that SGS had issued a laboratory report certifying problems with the Cargo's quality is almost certainly false. As Mr. Legemaate testified, and the documents corroborate, no record of an adverse quality report could be located in SGS's electronic records or by SGS's technical governance office, and the

12

Branch Manager of SGS in Iraq confirmed that his office had not issued, nor was it planning to issue, such a report.

Further, absent an adverse SGS quality report, it is difficult to perceive a set of circumstances by which GBI or TBI could have otherwise determined that the Cargo did not meet the Contract's quality specifications, thereby warranting their demand for payment under the Letter of Credit. At the time TBI made its request, on February 10, 2011, two-thirds of the Cargo had not even reached Iraqi shores, and the portion of the Cargo that had arrived, aboard the CAPTAIN HARRY, was still in the process of being unloaded. Moreover -- over the course of the CAPTAIN HARRY's journey from Darrow, Louisiana to Umm Qasr, Iraq -- SGS sampled, analyzed, and inspected the Cargo several times, and issued at least three reports certifying its quality. None of the several SGS reports issued with regard to the Cargo indicates any problem with the rice's quality, let alone a problem that would justify a full draw down on the Letter of Credit.

Based on the foregoing, the Court fails to perceive a "plausible or colorable basis under the contract" for TBI's request for payment under the Letter of Credit, see Itek Corp. v. The First National Bank of Boston, 730 F.2d 19, 24 (1st Cir. 1984) (Breyer, J.), and therefore concludes that the most reasonable interpretation of the relevant circumstances is that TBI's request was made in an attempt to effectuate a fraud. See id. at 24 (finding fraud where

13

the beneficiary "knowingly failed to comply with an important term in the underlying contract which the parties intended as a precondition for the beneficiary's exercise of his rights to call the letter [of credit].").

For the foregoing reasons, the Court concludes that ADM will be irreparably harmed absent an injunction, and is likely to succeed on the merits of its claims. Accordingly, the Court hereby grants ADM's motion for a preliminary injunction and enjoins Chase from rendering any payment to TBI under the Letter of Credit. The parties are directed to jointly call Chambers no later than March 9, 2011 to schedule any further proceedings in this case.

SO ORDERED.

Dated: New York, NY
       March 7, 2011

_____
JED S. RAKOFF, U.S.D.J.